David Meister #70703
ISCI 9B 39A
PO Box 14
Boise, ID 83707

Petitioner, pro se

U.S. COURTS

AUG 28 2020

Rcvd_____Filed_____Time_____
STEPHEN W. KENYON
CLERK, DISTRICT OF IDAHO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DAVID JOSEPH MEISTER,           )
                                )    CASE NO. 1:19-CV-00173-CWD
          Petitioner,           )
                                )    PETITIONER'S REPLY TO RESPONDENT'S
     v.                         )    ANSWER AND BRIEF IN SUPPORT OF
                                )    DISMISSAL OF PETITION FOR WRIT OF
AL RAMIREZ,                     )    HABEAS CORPUS
                                )
          Respondent.           )
_____)

COMES NOW David Meister, Petitioner pro se, and hereby Replies to Respon-
dent Al Ramirez's ("state") Answer  and Brief (Dkt. 28).

I.   FACTUAL AND PROCEDURAL BACKGROUND

Meister does not dispute the state's iteration of the procedural facts
of this case (dkt. 28 at 2-8) and so they need not be restated here. Meister
does dispute the state's iteration of the underlying substantive facts.
The state's version of trial facts does not fairly and accurately represent
the totality of the circumstances of the case, because the facts of the
prosecution's case are portrayed in the light most favorable to a finding of
guilt and the facts of the defense's case are inaccurately described or
completely omitted. (Id.) A fair and accurate representation of the trial
facts is pled in the Petition and supporting Declaration (dkt. 1-1 at Ex.
D) and is also given (with thorough citation to the record) in Petitioner's
Response to Respondent's Motion for Partial Summary Dismissal (dkt. 19 at
10-17), which is hereby incorporated by reference.

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 1

## II.   EXHAUSTION OF STATE REMEDIES

The state is correct that Meister has exhausted all available state remedies. (Dkt. 28 at 8.)

## III.   PROCEDURAL DEFAULT

This Court granted the state's motion and dismissed Claims 1, 2, 7 (in part), and 8 (in part) for procedural default. (Dkt. 24 at 8-18.) With respect to Claims 1, 2, and 7 (in part), Meister disputes this Court's finding that no cause and prejudice exists to excuse procedural default caused by counsel's failure to federalize the issues before the Idaho Courts of Appeals.

Dr. Richard Ofshe would have testified that he identified the use of coercive and suggestive interrogation tactics that caused Meister to confess. The trial court excluded that evidence because (1) the court's preliminary ruling on voluntariness of the confession precluded later challenge at trial and (2) it would infringe the province of the jury to determine the credibility of the confession and Meister. (Dkt. 1-1, Ex. C at 8-10.) At direct appeal of that ruling, counsel argued broadly that the court violated Meister's right to present expert testimony under rule of evidence 702. Appellate counsel, however, did not cite any Idaho law or case law specifically addressing a defendnat's right to use an expert to challenge the voluntariness and credibility of his confession. There was no Idaho case law on this point at the time of appeal in 2012 - 2014.

However, in Crane v. Kentucky, 476 U.S. 683 (1986), the Supreme Court had specifically addressed the matter, in the context of a defendant's Sixth and Fourteenth Amendment right to present a complete defense. Crane held that (1) a preliminary determination of voluntariness does not foreclose a defendant from later challenge to voluntariness at trial and (2) expert testimony about the circumstance of the interrogation and confession is

not objectionable because it bears on ultimate issues of credibility. 476 U.S. at 687–89.

The constitutional argument of Crane pertains more specifically to the circumstances of the preclusion of Ofshe than does the evidentiary error argued by appellate counsel, and therefore this Court has erroneously determined that counsel's evidentiary-error argument was stronger than the constitutional violation. (Dkt. 24 at 16.) It is objectively unreasonable for counsel to neglect the stronger argument, which indicates ignorance of the law, and, thus, is "cause" to excuse procedural default caused by counsel's deficient performance. This Court's additional finding of no prejudice (dkt. 24 at 16-17) is also in error, for those reasons already argued in Petitioner's Response to Respondent's Motion for Partial Summary Dismissal. (Dkt. 19 at 17-29.) That Response (dkt. 19) asserts cause and prejudice to excuse default of Claims 1, 2, and 7 (in part), and is incorporated by this reference.

## IV.  STANDARDS OF LAW REGARDING HABEAS CORPUS AND AEDPA

Federal habeas corpus relief is available to state prisoners under 28 U.S.C. § 2241(c) if the state courts' adjudication of the underlying claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" (§ 2254(d)(1)), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" (§ 2254(d)(2). A federal law is "clearly established" by Supreme Court holdings, but not by dicta. Yarborough v. Alvarado, 541 U.S. 652, 659 (2004). However, "the lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since 'a general standard'

from this Court's cases can supply such law." Marshal v. Rodgers, 133 S.Ct. 1446, 1449 (2013) (quoting Yarborough, 541 U.S. at 664).

A state adjudication is "contrary to" clearly established federal law if it (1) applies a rule that contradicts the governing law as set forth in Supreme Court cases, or (2) confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nonetheless arrives at a different result. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). If a state court decides a claim on its merits but without explaining its denial or citing any case law (state or federal), then the level of deference owed under AEDPA's "contrary to" provision is "relaxed" (but not eliminated) and the federal court must independently review the record to determine whether the state court clearly erred in its application of Supreme Court law. See e.g. Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). If a state court does not adjudicate a properly submitted claim but dismisses it by mistake, then the decision is "contrary to" Supreme Court precedent and the federal court may exercise de novo review of the claim. See e.g. Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002).

A state adjudication is "unreasonable" if it is "so lacking in justification that there [is] an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Harrington v. Richter, 562 U.S. 86, 101 (2011).

A state adjudication is "based on an unreasonable determination of facts" if "an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012). An "unreasonable determination of the facts" may result from the fact-finding process itself, on the ground that it was deficient in some material way. Id.

For example, a factual inquiry may be unreasonable when contaminated by a substantive legal error, Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir. 2004), such as when the state court makes factual determinations without allowing the petitioner opportunity to develope material facts through the process of discovery and/or evidentiary hearing. See Hurles v. Ryan, 706 F.3d 1021, 1038-40 (9th Cir. 2013).

### V.   UNREASONABLE APPLICATION OF STICKLAND V. WASHINGTON

At state post-conviction, Meister alleged that trial counsel's performance was constitutionally deficient, stating several claims. The county attorney moved for summary disposition, correctly identifying Strickland v. Washington, 466 U.S. 668, 687-88 (1984), as controlling claims of Sixth Amendment ineffective assistance of counsel, which case required Meister to show (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id. Relying on the first Strickland prong, the county argued that Meister's claims were defeated by the presumption that counsel's trial strategies are within the objectively reasonable range, which presumption cannot be rebutted without a showing that counsel's actions were based on inadequate preparation, ignorance of the law, or other shortcomings capable of objective evaluation. (Dkt. 10, PT2, Vol. 19 at 4469-70.) In response, Meister did not argue "inadequate preparation" or "ignorance of the law," but that counsel's failures in certain circumstances are "capable of objective evaluation" when there is no reasonable strategy or tactic for their actions. Meister argued that such is prima facie proof of incompetence when an issue is material or crucial to a defense. Meister requested discovery and an evidentiary hearing to further develope his claims.

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 5

However, Meister's arguement was rejected and his claims were summarily dismissed without discovery or evidentiary hearing. String citing Idaho case law, the Idaho Court of Appeals affirmed the dismissal, holding that Strickland's presumption of counsel's reasonableness dictates that trial strategy, in of itself, is per se immune from challenge as unreasonable: "This Court has long adhered to the proposition that tactical or strategic decisions of trial counsel will not be second-guessed on appeal unless those decisions are based on inadequate preparation, or other shortcomings capable of objective evaluation." Meister v. State, Docket 44322 (Idaho Ct. App. Dec. 24, 2018) (unpublished) [Dkt. 10, PT1, #9 at 6, 19]. That boilerplate was the dispositional theme of most of Meister claims:

* Claim Three(A)-(F) that counsel were objectively deficient by not presenting evidence that Meister's confession was false and Claim Four that counsel failed to present alibi evidence were both summarily dismissed because,

> The Petitioner's assertions do not raise a genuine issue of material fact that counsels' tactical decisions fell below an objective standard of reasonableness, or that they were based on lack of preparation or ignorance of the law. The court presumes that trial counsel was competent and that trial tactics were based on sound legal strategy. . . . In the case at hand, the Petitioner has not shown that trial counsels' decision was based on a lack of preparation. . . .

(Dkt. 10, PT2, Vol. 21 at 4469.) The Idaho Court of Appeals affirmed:

> The decision of what evidence should be introduced at trial is a tactical decision. . . . Meister does not direct this Court to evidence in the record that would support an inference that trial counsel's decision was not "tactical or strategic." . . . Meister provides no evidence which suggests that counsel's decisions resulted from inadequate preparation, ignorance of the law, or other shortcoming.
> . . .
> The decision of what evidence should be introduced at trial is a tactical decision. . . . Meister has provided no evidence which suggests that counsel's decisions resulted from inadequate prep-

aration, ignorance of the law, or other shortcomings. Rather,
Meister's argument boils down to second-guessing trial counsel's
tactical or strategic decisions. . . ."

(Dkt. 10 PT1, #9 at 19-20, 21-22 (citations omitted).)

\*     Claim Five(A)-(B) that counsel were objectively deficient for

introducing prejudicial evidence was dismissed because,

> The Petitioner fails to show that trial counsels' decision fell
> below an objective standard of representation. . . ."
> . . .
> The Petitioner fails to establish that the tactical decisions
> of counsel fell below an objective standard of reasonableness,
> or that the decision was based on lack of preparation or ignorance
> of the law.

(Dkt. 10, PT2, Vol. 21 at 4467, 4469.) The appeals court affirmed:

> What evidence should be introduced at trial is a tactical decision.
> . . . Meister has provided no evidence which suggests that counsel's
> decisions resulted from inadequate preparation, ignorance of the
> law, or other shortcomings.
> . . .
> [I]t appears trial counsel made a tactical decision. . . . While
> potentially not the most strategic decision, Meister has failed
> to demonstrate that counsel was objectively unreasonable.

(Dkt. 10, PT1, #9 at 35, 37.)

\*     Claim Six(B)-(F) that counsel were objectivley deficient for failing

to object to prosecutorial misconduct was dismissed for the same:

> The petitioner fails to raise a genuine issue of material fact
> that trial counsels' representation violated an objective standard
> of reasonableness. . . . With respect to Petitioner's claims that
> counsel should have objected to statements the prosecutor made
> in closing, the court notes that counsel is given considerable
> latitude in their presentation. . . . Further, decisions to object
> during closing arguments are tactical and will not be second-guessed
> on appeal.

(Dkt. 10, PT2, Vol. 21 at 4468.) The Idaho appeals court affirmed Claim

Six(F) on similar ground:

> Even if the statement [in the state's closing argument] was objec-
> tionable, Meister has not presented any evidence counsel's failure
> to object was not strategic.

(Dkt. 10, PT1, #9 at 34.) [The district court's dismissal of Claim Six(A) and the Idaho Court of Appeals' handling of Claims Six(A)-(E) were based on an erroneous prejudice analysis, which is discussed at section VI. Unreasonable Determination of Facts, below.]

Idaho's "long adherence" to the proposition that strategic or tactical decisions of counsel are per se immune from challenge is now championed by the state here on habeas review. (Dkt. 28 at 19 (challenge to strategy is, "a[t] best, an argument questioning the means by which trial counsel choose to present the defense.").) Meister responds that Idaho has unreasonablly construed Strickland to exclude challenge to counsel's strategy or tactic.

Although it is true Strickland cautions against judging counsel's decisions in hindsight and suggests that a presumption in favor of reasonableness is therefore appropriate, it does not dictate that this presumption categorically preclude challenge to a "strategic or tactical" choice as objectively unreasonable in the context of the trial:

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in a particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Strickland, 466 U.S. at 690. Nowhere in this formulation did the Supreme Court categorically limit proof of unreasonableness to "inadequate preparation, ignorance of the law, or other shortcoming capable of objective evaluation." (Dkt. 10, PT1, #9 at 6.) Idaho's insistence that it does and it also forecloses challenge to strategical choices is akin to the type of dilution

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 8

of Stickland advised against in Marshall v. Hendricks, 307 F.3d 36, 110

(3rd Cir. 2002):

> The problem with the [New Jersey] Court's reasoning is that, while
> referencing specific factors on which counsel's decision regaring a
> closing argument can depend, the Court actually knew nothing regarding
> whether those factors played any role at all in [counsel's] decision,
> but assumed that a strategic choice would have been "difficult." . . .
> [T]he New Jersey Supreme Court has in essence created a new standard
> that would hold any strategy reasonable    if the choices presented
> to counsel were "difficult."

Similarly, Idaho has in essence created a new standard holding any strategy

reasonable, absent direct proof along its invented three-point criteria

(above). That requirement is contrary to Strickland's guidance that counsel

decisions are to be evaluated in view of counsel's function "to make the

adversarial testing process work in a particular case." Strickland, at 690.

The emphasis is on the particular circumstance of the case, and there is

no requirement that the petitioner present direct evidence of an unreasonable

choice. Indeed, leading Supreme Court cases Williams v. Taylor, 529 U.S.

362 (2000), Wiggins v. Smith, 529 U.S. 510, 525-26 (2003), and Rompilla

v. Beard, 525 U.S. 374, 385-86 (2005), all granted relief for ineffective

assistance of counsel, finding that counsel's "strategic" choices were NOT

reasonable.

   With particular relevance to Claims Three and Four (counsel's failure

to present evidence contradicting the confession and failure to present evidence

of alibi), the case of Alcala v. Woodford, 334 F.3d 862 (9th Cir. 2003),

exemplifies the point here: Trial counsel testified that he was aware of

potential alibi witnesses, but could not recall why their testimony was

not presented at trial. Id. at 871. Although there was no direct proof from

counsel of unreasonable strategy, and no allusion of inadequate preparation

or ignorance of the law, the Ninth Circuit nonetheless held it objectively

unreasonable for counsel to neglect the alibi evidence because it was compatible with but more persuasive than the alibi evidence counsel did present. Id. at 870-72; see also Thompson v. Calderon, 120 F.3d 1045, 1052-53 (9th Cir. 1997) (counsel testified to foregoing evidence against the rape's occurrence, to instead pursue strategy that an alternative perpetrator commited the rape; but the strategy was unreasonable because available pathologist would have testified that the victim's injuries and other evidence did not indicate a rape had happened).

In Cannedy v. Adams, 706 F.3d 1148 (9th Cir. 2013), the Circuit Court presumed trial counsel knew of the inconsistent statement from the victim, and found that the California Court of Appeal unreasonably applied Strickland when the court presumed counsel's strategy to omit the evidence because the statement contradicted some of the defendant's testimony. Id. at 1162. The Court held that the difficulty was easily explained away by other evidence "and the extremely high exculpatory value of the [inconsistent statement] [,] [rendered the California Court of Appeal] objectively unreasonable to conclude that [the] trial lawyer rendered effective assistance by declining . . . to introduce the evidence." Id.

Relevant to Claim Five (counsel's introduction of prejudicial evidence), and further on point that counsel's "strategy" can be per se challengeable, the district court in Sager v. Maass, 907 F.Supp. 1412 (D. Oregon 1995) held there was evidence that trial counsel introduced a victim impact statement to tactically use it as a handwriting sample and to impeach the witness. Id. at 1419. The district court held that, regardless, trial counsel's strategy was objectively unreasonable because of the prejudicial effect of having introduced the balance of the entire victim impact statement. Id. at 1419-20; see also Berryman v. Norton, 100 F.3d 1089, 1099-1100 (3rd Cir. 1996)

(appellate division of the Superior Court of New Jersey affirmed dismissal of post-conviction claim because trial counsel testified he cross-examined the detective to attack the lack of investigation, and so it was a matter of "strategy"; however, New Jersey was reversed because "strategy" was objectively unreasonable because the cross-examination opened the door to prejudicial re-direct).

Relevant to Claim Six (counsel's failure to object), the case law is consistent that a missed objection to prejudicial evidence or argument can be prima facie proof of counsel's inattention, neglect, or ignorance of law. For instance, in Sager v. Maass, supra, counsel failed to object to a prejudicial tape recording of a 911 phone call that referred to the defendant as "Nazi Red" and described him as a habitual criminal. 907 F.Supp at 1420-21. The district court held that the failure to object implied defense counsel had not listened to the 911 tape and that failure to object was objectively unreasonable, even though the statements were arguably admissible as an excited utterance. Id.

In Washington v. Hofbauer, 228 F.3d 689, 702-06 (6th Cir. 2000), the Circuit Court found trial counsel's failure to object to the prosecutor's closing argument (though generally consistent with defense strategy) was objectively unreasonable because the argument impermissibly implied the defendant was the "type" of bad person who would commit the crime. The Court noted that counsel failed to object at least partially from trial strategy (id. at 704) but expounded "we cannot stop there, for we must also assess if this strategy itself was constitutionally deficient. . . . [E]ven deliberate trial tactics may constitute ineffective assistance of counsel if they fall outside the wide range of professionally competent assistance. . . . [T]he label 'strategy' is not a blanket justification for conduct

which otherwise amounts to ineffective assistance of counsel." Id. (citations and quotations omitted; emphasis added).

Given the plain language of Stickland and the overwhelming weight of the case law interpreting it, it is "beyond any possibly for fair-minded disagreement" that counsel's "strategic or tactical" choices ARE subject to per se challenge given the contours of a particular case. Harrington, 562 U.S. at 101. Idaho's contrary application of Strickland is, therefore, unreasonable, and this Court may proceed to de novo review of Meister's ineffective assistance of counsel claims, under 28 U.S.C. § 2254(d)(1). In the alternative, this Court may exercise de novo review under § 2254(d)(2), given that the Idaho courts' disposition of Meister's factual allegations of IAC was fundamentally contaminated by Idaho's "long held" misapprehension that strategy cannot be challenge on its face under Strickland. See Taylor, 336 F.3d at 1001 (a factual inquiry ma ... unreasonably when infected by a sustantive legal error).

VI.   UNREASONABLE DETERMINATION OF FACTS

A.   Idaho Failed to Consider Totality of the Case Circumstances, and Evidence of Guilt is Not "Overwhelming"

The second prong of Stickland requires Meister to show prejudice from counsel's unprofessional performance, that there is a reasonable probability that, but for counsel's errors, the result of trial would have been different. 466 U.S. at 687-88. At state post-conviction, the county argued that the earlier finding of "overwhelming evidence of guilt" by the Idaho Court of Appeals (a result from Meister's direct appeal) necessarily foreclosed finding of prejudice in subsequent post-conviction claims of IAC. (Dkt. 10, PT2, Vol. 17 at 3576-77; Vol. 20 at 4332-33.) The district court agreed and supplied that rationale as an alternative basis for summary dismissal of

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 12

Meister's IAC claims under Strickland's second prong. (Dkt. 10 PT2, Vol.
21 at 4457-58, 4468, 4470.) On appeal of that decision, the Idaho Court
of Appeals affirmed, and affirmed its earlier finding of overwhelming evidence
of guilt. (Dkt. 10 PT1, #9 at 3-4, 10, 35 n.10, 38.)

There are, however, several problems with the findings of "overwhelming"
evidence and the courts' reliance on it to dismiss Meister's claims. First,
the Idaho Court of Appeals' finding of overwhelming evidence of guilt on
direct appeal (State v. Meister, Docket No. 39807 (Idaho Ct. App. Mar. 4,
2014) and appeal of post-conviction (Meister v. State, Docket No. 44322
(Idaho Ct. App. Dec. 24, 2018) conflict with the Idaho Supreme Court's pre-
vious opinion that granted Meister a new trial (State v. Meister, Docket
No. 35048 (Idaho Sup. Ct. July 7, 2009). The Idaho Supreme Court considered
the same underlying trial facts and did not find evidence of guilt over-
whelming. Id.

Second, the purpose of state post-conviction is to determine if error
prejudiced the rights of the defendant based on the expanded collateral
record not available at direct appeal. Strict reliance on the trial record
is therefore unreasonable, and flies in the face of Supreme Court precedent
which emphasizes that in determining Strickland prejudice, the court must
examine both the trial testimony AND the post-conviction evidence. Williams
v. Taylor, 529 U.S. 362 (2002). Binding direct-appeal prejudice analysis,
in theory, would enervate the entire post-conviction process in many circum-
stances, and has in particular in this case.

Third, the Idaho Court of Appeals' finding of overwhelming evidence
of guilt was fundamentally flawed by failure to evaluate the totality of
the evidence presented at trial. Specifically, the appeals court, and post-
conviction court, found the evidence against Meister to be overwhelming

by considering only the prosecution's facts and version of the evidence. That type of one-sided analysis is specifically proscribed by Supreme Court law. This Court is respectfully referred to Petitioner's Response to Respondent's Motion for Partial Summary Dismissal (dkt. 19 at 22-26) which has already briefed the facts and supporting authority on this point, and is incorporated by this reference.

Fourth, the Idaho courts' finding of overwhelming evidence of guilt, "beyong a reasonable doubt," is unreasonable because it is in fact not supported by the trial record. There was no direct proof Meister committed the crime; Meister's confession is not conclusive and is plagued by inconsistencies; evidence exists that the confession was coerced; witnesses who claim Meister made inculpatory statements are inconsistent; virtually no evidence was presented that Meister conspired with Lindermn, and thus virtually no evidence exists for Meister's allege motive; circumstantial evidence that Meister owned a handgun and may have owned shoes consistent with shoe prints found at the crime scene do not uniquely and conclusively tie Meister to the crime; alibi evidence indicates it was unlikely Meister could have committed the crime in the way and time frame argued by the state; and substantial evidence indicates an alternative perpetrator possessed detailed knowledge of the crime scene, had motive and opportunity to commit the crime, admitted to being in the area of the crime when it occurred, fit the witness description of the shooter better than did Meister, and confessed to the crime on numerous occasions. Again, this matter has been briefed at length, and this Court is respectfully referred thereto at Docket 19, pages 10 to 17, which is incorporated by this reference.

For the above reasons and those incorporated by reference, the Idaho courts' Strickland prejudice analysis was based on both an unreasonable

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 14

application of Supreme Court law and an unreasonable determination of the facts of the trial, and this Court may exercise _de novo_ review under §§ 2254(d)(1) and (d)(2).

    B.   <u>Idaho's Determination of Facts Was Unreasonable Because It Did Not Provide Opportunity for Discovery or Evidentiary Hearing</u>

Meister presented the state post-conviction court with <u>prima facie</u> evidence of claims of IAC, which claims are discussed in the next section of this Reply. Regardless of that evidence, the district court summarily dismissed each IAC claim without providing Meister opportunity to present supporting evidence at hearing and, further, to utilize the process of discovery to obtain certain evidence necessary to support several claims. The Idaho Court of Appeals affirmed the denial of discovery and evidentiary hearing, and affirmed the summary dismissal of each IAC claim. Meister's Motion for Rule 6 Discovery; Evidentiary Hearing; and Appointment of Counsel and supporting brief--filed contemporaneously with this Reply--details the evidence sought in discovery, why it was and remains relevant to substantiate each claim, and why this Court can and should grant discovery and evidentiary hearing, which motions and arguments are hereby incorporated by reference.

This Court may, for the above reasons, engage _de novo_ review of Meister's IAC claims because Idaho's denial of the same was based on an unreasonable determination of the facts (§ 2254(d)(2)) that resulted from a fact-finding process infected by the substantive legal error of denying Meister opportunity to develop the necessary factual record. <u>Hurles</u>, 706 F.3d at 1038-40; <u>Hibbler</u>, 693 F.3d at 1140; and <u>Taylor</u>, 366 F.3d at 1001.

    VII.  <u>SPECIFIC MERITS BRIEFING REGARDING PETITIONER'S CLAIMS</u>

    A.  <u>Claim Three</u>

1.  Claim Three(A)

Meister confessed that Jesse Linderman hired Meister after he heard
Meister announce to a group of Pizza Pipeline coworkers that he would kill
a person for a $1000. (Dkt. 10 PT2, Vol. 17 at 3581: 20-27.) At trial, defense
counsel argued in closing that the state had not presented any witnesses
who claimed to have heard Meister make the announcement at Pipeline. (Tr.
4045 ["Tr." refers to the 2011 Trial Transcript which begins at R. Vol.
11, p. 2310, of dkt. 10 PT2].) The county argued at summary disposition
that defense counsel made a tactical decision not to present witnesses and
instead argue the state had not meet its burden of proof. (Mar. 15, 2016
HRG Tr. 9-10 [dkt. 17, E-23].) The Idaho Court of Appeals did not mention
the county's argument but noted that defense counsel presumably provided
competent representation by arguing in closing that there were inconsistencies
between the confession and the facts of the case. (Dkt. 10 PT1, #9 at 20.)
The state now argues, in addition, that defense counsel's approach was reason-
able because "the fact that officers could not corroborate Meister's state-
ment . . . does not prove that the statement wasn't made[.]" (Dkt. 28 at
20.)

That last is clearly contradicted by the fact that defense counsel
DID argue in closing that the state did not put on anyone claiming Meister
made the $1000 statement. That point WAS part of the strategy to undercut
the confession. Nonetheless, the way in which that strategy was pursued was
ineffective because reasonable counsel would have argued that police inver-
viewed ALL of Meister's Pipeline coworkers (Tr. 1501: 4-8) and presented
evidence that, after Meister confessed, police interviewed these coworkers
specifically about the $1000 comment and none could recall it. (Dkt. 1-1
at 18-19; Dkt. 10 PT2, Vol 20 at 4261-62, 4266, 4271, 4274-75.)

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 16

It is objectively unreasonable to rely on closing argument of a weakness in the state's case in lieu of presenting available and persuasive evidence that no coworker ever heard the statement. Counsel's performance was deficient because it left open the possibility for the jury to conclude that the statement could have been made but to coworkers who perhaps not asked about it by police.

   2.   Claim Three(B)

Meister confessed that Linderman said he wanted out of his relationship with Hart but ended it once and said she "went psycho" and he was afraid she would kill him or herself and was worried her father might harm him. (Dkt. 10 PT2, Vol 17 at 3582: 13-20.) The prosecution presented evidence of Linderman and Hart's breakup in Spring 2001 (Tr. 828-831, 872-74), Hart's emotional distress over it (id.), and that Hart's father once threatened Linderman (Tr. 2461-63), and then argued at closing that Meister's knowledge of these facts suggest conspiracy with Linderman. (Tr. 4006-08.) Defense counsel did not address this evidence in closing. (Tr. 4017-51.)

   The evidence of Meister's knowledge of Linderman/Hart relationship (and Linderman's phone number found in Meister's wallet (discussed below)) is the ONLY evidence linking Meister's confession to objective facts about Linderman and the alleged motive for the crime. The prosecution highlighted the evidence by producing several witnesses to discuss the turbulent breakup and why Linderman might fear Hart's father, and examined detectives and Meister about his knowledge of the facts. (Tr. 2066, 3346-48.)

   Instead of ignoring the state's evidence and theory of motive, reasonable defense counsel would have presented available evidence that Linderman openly spoke with his Pipeline coworkers about the Spring 2001 breakup and his relationship with Hart at the time (dkt. 1-1 at 19-20; dkt.10 PT2, Vol.

20 at 4282, 4286) and argued in closing that Meister's knowledge of the
relationship was therefore not unusual but, rather, supports Meister's testi-
mony that he improvised his confession from available facts. (Tr. 3348:
15-17; 3431-3459.) The state argues that defense counsel reasonably omitted
this evidence because the "fact that others may have known about the negative
dynamics of the Hart/Linderman relationship does not prove that Meister
did not learn what he knew through information provided by Linderman in
preparation for the murder[.]" (Dkt. 28 at 20-21.) The state is correct
that others' knowledge of relationship details does not prove Meister did
not gain the information in preparation for the murder. Regardless, it does
conclusively disprove he had unique knowledge of the relationship, and goes
a long way to combat the prosecution's suggestion that Meister suspiciously
knew too much. Such evidence that the confession could have been fabricated
on this point is far more persuasive than the NOTHING that defense counsel
presented or argued.

   3.  Claim Three(C)

   Meister confessed that he retrieved Linderman's phone number and contact
information at Pipeline on the night of the shooting December 11, 2001,
and placed it in his wallet. (Dkt. 10 PT2, Vol 17 at 3586: 18-25.) LCSO
Detective Hall testified that he found Linderman's phone number on a slip
of paper in Meister's wallet. (Tr. 1969-1970; 1999-2000; 2003.) Reasonable
defense counsel would have combatted that testimony by presenting evidence
from the Adelphia company that the number found in Meister's wallet was
in fact a pager number and could not have been given out on December 11,
2001, because it was not in service until February 2002. (Dkt. 1-1 at 20-
21; dkt. 10 PT2, Vol. 20 at 4218-24.) Reasonable counsel would have then
been able to argue in closing that the inconsistency is proof that Meister

improvised his confession from available circumstances. (Tr. 3431-59.)

The state argues that defense counsel strategically left out the evidence because "the fact that the pager number purportedly found in Meister's wallet upon his arrest was not in service until after the murder was committed does not prove Meister did not have Linderman's different, then-current contact info in his possession at the time of the murder, consistent with the confession[.]" (Dkt. 28 at 21.) That argument, however, is a non sequitur because the jury DID hear that Linderman's number was found in Meister's wallet. It is beyond debate that only pure incompetence could allow the jury to deliberate with the unchallenged impression that Meister's confession was corroborated by the number in his wallet. Obviously this is so because the evidence seemingly proved the confession, but is also incompetent because this evidence and the evidence of Meister's knowledge of the Linderman/Hart relationship (discussed above) was the ONLY objective evidence of conspiracy and motive.

4. Claim Three(D)

Meister confessed that he fled over a hill and field behind Hart's trailer and encountered a police cruiser pulling onto North Polk Extension (NPE) as Meister emerged from the field and onto NPE, at about 10:15 p.m. (Dkt. 10 PT2, Vol. 17 at 3583: 21-25; Tr. 2069; 3228-29.) Defense counsel argued in closing that Meister's confession was false because he could not have seen a police vehicle on NPE because they were all out on Highway 95 at the time. (Tr. 4027: 7-11.) The Idaho Court of Appeals found counsel's closing argument was sufficient performance because "no police vehicle was on that road [NPE]." (Dkt. 10 PT1, #9 at 20.)

However, the appeals court has unreasonably mistaken the facts. (§ 2254(d)(2). Evidence was NOT presented that no police vehicle was on NPE

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 19

at the time. Indeed, in closing argument the prosecution vigorously argued
that flaw in defense counsel's argument, specifically that a law enforcement
vehicle could have been on NPE around 10:15 p.m. because there was no evidence
in record accounting all their whereabouts at that time. (Tr. 4058: 16-24.)
The state now argues, in addition, that defense counsel reasonably excluded
evidence of the whereabouts of police vehicles because "Meister did not,
in his confession, say exaclty when and where he saw a police vehicle and
heard an ambulance after committing the murder, nor did he identify what
type of police vehicle he saw[.]" (Dkt. 28 at 21.)

   The state misconstrues the facts. Meister's third, recorded confession
says he saw a "police officer" in vehicle (Dkt. 10 PT2, Vol 17 at 3583:
21-25), an interrogator says Meister's first, unrecorded confession described
a "patrol car" (Tr. 2069: 10-20), and Meister's trial testimony in 2011
(consistent with his 2003 trial testimony) states that he confessed to seeing
a "police car" or "cruiser" (Tr. 3229:9). The confession and interrogating
officer and Meister all state Meister said he saw a police car or cruiser
on NPE just seconds or a minute or two after the shooting. (Id.) It is undis-
puted that the shooting happened around 10:15 p.m. Moscow Police Department
and Latah Sheriff's Department records indicate there were no patrol cars
(or any police vehicle) on NPE around 10:15 p.m. (Dkt. 1-1 at 21-22; dkt.
10 PT2, Vol. 12 at 4288.) Reasonable defense counsel would have, therefore,
presented the evidence that police whereabouts were accounted for, none
were on NPE around the time of the shooting, the footprints in the snow
on NPE did not indicate the suspect stopped or "hunkered down" to wait for
the police car to drive away (Tr. 1044; 2069: 10-10), and argued in closing
that these inconsistencies demonstrate Meister's confession to be false.

   On the other hand, it was objectively unreasonable for defense counsel

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 20

to argue in closing that "all police vehicl- were out on Highway 95" without
any supporting proof of that, and allow the prosecution to eviscerate the
argument along its obvious flaw and persuade the jury that perhaps a police
vehicle could have been on NPE.

5.   Claim Three(E)

Meister confessed that, after the police cruiser pulled away, he fled east
from NPE into a field and over a second hill. (Dkt. 10 PT2, Vol. 17 at 3583:
24-26; Tr. 3228-29.) Evidence was elicited that tracks were found leading
from Hart's trailer to and south down NPE until disappearing, and that several
officers searched but did not find indication of footprints further down
or along the sides of NPE. (Tr. 1046-76.) Defense counsel did not discuss
the officers' testimony in closing but did argue that tracks were not found
crossing a second hill (Tr. 4067: 12-13) and also that law enforcement
searched for further tracks from a helicopter the next day. (Tr. 4032-33.)
However, evidence was elicited that visibility of the fields from the heli-
copter was poor (Tr. 1432; 1959, 1997-98), and the prosecution argued in
closing that the helicopter search was limited to the area of the known tracks
and that it was possible more tracks existed east or south of NPE. (Tr.
1432-33; 4059-60.) The state argues now, as the prosecutor did then, that
"Meister did not describe his 'flight path' from the murder in perfect detail,
making it difficult for investigators, or his defense team, to either corrobo-
rate his account or disprove it[.]" (Dkt. 28 at 21.)

But that is misdirection. Meister confessed that he fled into a field
along NPE soon after encounter a police cruiser. Several officers searched
the fresh snow berms at the sides of NPE, and searched several times in
the area where the tracks disappeared and also farther south: There was
no indication in the snow that footprints led from the road into a field

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 21

around NPE and <u>it would have been impossible to enter a field from the road without leaving tracks</u>. (Dkt. 1-1 at 22-24.) That evidence conclusively disproves Meister's confession that he fled into a field from NPE. Reasonable defense counsel would have presented this to the jury, and then argued in closing that the confession's inconsistency with the physical evidence of crime scene supports Meister's testimony that he improvised a flight path based on his general knowledge of the north Moscow area. (Tr. 3434; 3431-59.) It was objectively unreasonable for counsel to neglect conclusive evidence and allow the prosecution to persuade the jury that tracks could have led from NPE but were not found because police didn't know where to look.

6.  Claim Three(F)

Meister confessed that he discarded brown corduroys and a red shirt in the snow after he crested the second hill, east of NPE. (Dkt. 10 PT2, Vol. 17 at 3583: 26-27.) Defense counsel argued broadly that no clothes were found. (Tr. 4027: 13-14; 4032-38.) The Idaho Court of Appeals reasoned this was sufficient performance from counsel because "no clothes were ever found." (Dkt. 10 PT1, #9 at 20.) But the appeals court unreasonably mistakes the facts. (§ 2254(d)(2).) Evidence <u>was</u> presented that no clothes were ever found around the <u>known</u> tracks west of and down NPE. (Tr. 1036-76.) Indeed, the prosecution argued that evidence in closing, that it was an open question whether clothes could be in the fields <u>east</u> of NPE because police did not know where to search at the time of the shooting and the helicopter fly-over did not encompass areas east or south down NPE. (Tr. 4059-60.) Which is the state's current position as well. (Dkt. 28 at21.)

However, considerable evidence existed that law enforcement <u>extensively</u> searched the fields and hill east of NPE after Meister's confession and found no clothing. Additionally, the property owner of the fields along

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 22

NPE mowed the fields himself in the Summer of 2002 and was certain no clothing was discarded on his property at that time. (Dkt. 1-1 at 25-26.) Reasonable counsel would have presented that evidence (rather than nothing at all) and argued in closing that the missing clothes supports Meister's testimony he improvised a false confession. (Tr. 3231-59.) Counsel's neglect on this point, however, was objectively unreasonable because it allowed the prosecution to argue Meister's confession to discarding clothes east of NPE was viable because the area was not searched.

    7.   Closing Reply Regarding Claim Three

    Citing the Idaho Court of Appeals, the state contends that Claim Three must fail under Strickland's first prong because

> trial counsel "tactically forwent" more specific evidence and argument that Meister's confession was false in order to focus more primarily on two other defense theories--the alternative perpetrator theory; and the theory that the confession was coerced, as supported by defense expert witness Dr. Ofshe's testimony.

(Dkt. 28 at 20.) The first problem with this contention is that it is pulled from thin air. Harrington, 562 U.S. at 105-06 (the court "may not indulge post hoc rationalizations for counsel's decision making that contradicts the available evidence of counsel's actions"). And is therefore based on an unreasonable application of Strickland. (§ 2254(d)(1).) Meister's request for discovery and evidentiary hearing to delve defense counsel  actions was denied, and thus the court, "while referencing specific factors on which counsel's decision . . . can depend," "actually knew nothing regarding whether those factors played any role at all in [counsel's] decision[.]" Marshall, 307 F.3d at 110.

    The other problem with the state's argument is that it is unreasonable in view of the record: The defense was not constrained in time, days, or number of witnesses in which to present its case, and so counsel did not

choose one defense over another because of procedural constraints. Nothing in the argument or evidence of the alternative perpetrator defense would have been undercut by the evidence the confession was objectively false. Rather, the two defenses, obviously, complement each other. And the purpose of Dr. Ofshe's testimony about coercive interrogation tactics was to support Meister's testimony that he confessed falsely. Without defense evidence that the confession was false, Ofshe's theories would not have even been relevant at trial.

Since a coerced confession can still be true, Ofshe explained that the veracity of the confession must be evaluated against the known circumstances of the crime. (Tr. 2994.) There is no sense in focusing on evidence of coercion, to the exclusion of evidence that the confession is actually false. Meister's trial defense was that HIS CONFESSION WAS FALSE. Counsel's failure to support that defense with persuasive evidence is objectively unreasonable, and is prima facie proof of neglect. And yet, the state counters that defense counsel "strategically forwent" specific evidence to instead engage a "broad attack of the accuracy of Meister's confession." (Dkt. 28 at 20 n.3.) The state suggests the "broad" approach was reasonable because the specific evidence against the confession was presented at Meister's first trial, which defense was unsuccessful. (Id. at 22.)

The state's suggestion is pure speculation, however. There is no evidence in record whatsoever that trial counsel chose a "broad" approach because a "specific" approach had previously been unsuccessful. The state post-conviction court did not permit defense counsel to testify about their decision making. Additionally, there is no evidence that Meister's defense at the first trial was unsuccessful because of the specific approach against the confession. It is just as easy to speculate failure at the first trial was

because--just as in the second trial--defense expert was not permitted to testify about specific factors that coerced Meister to confess.

The state doubles down on the Idaho Court of Appeals' reasoning that "Meister ignores the fact that counsel had the hindsight of the previous trial in which to make tactical and strategic decisions upon which to base its defense." (Dkt. 28 at 22.) But this is unfair. The Idaho Court of Appeals and the state, now, have not explained how "hindsight" was supposed to have informed counsel's choices. How is Meister supposed to respond? Was, for example, a flaw in the evidence discovered in hindsight? Did the specific evidence of false confession somehow undermine a defense witness? Or the alibi? Or the alternative perpetrator defense? It is not obvious how this may be so. And on the other hand, Meister has argued the omission of specific evidence--for instance--that numerous officers extensively searched but found no tracks in the fresh snow anywhere along North Polk Extension (dkt. 1-1 at 22-24) is at least prima facie proof of defense counsel's negligence. Meister argued this is so because the evidence conclusively disproves Meister's confession that he feld into a field along NPE after the shooting. The Idaho Court of Appeals and state have ignored Meister's challenge to provide an objective reason for defense counsel to omit this evidence.

Moreover, the "problem with [the Idaho courts'] reasoning is that, while referencing specific factors on which counsel's decision regarding ["hindsight"] can depend, the Court actually knew nothing regarding whether these factors played any role at all in [counsel's] decision, but assumed that a strategic choice would have been [the product of "hindsight"]. . . . [The Idaho Court of Appeals] has in essence created a new standard that would hold any strategy reasonable if [counsel was involved in the case from a previous trial]." Marshall, 301 F.3d at 110. Idaho's new

"hindsight" rule dilutes the standard of Strickland and is therefore an unreasonable application of Supreme Court precedent. (§ 2254(d)(1).)

Lastly, the state acknowledges that the Idaho Court of Appeals affirmed the dismissal of Claim Three without      specifically referring to Strickland's prejudice prong., but nonetheless asks this Court to deny Claim Three because evidence of Meister's guilt is overwhelming. (Dkt. 28 at 23.) For the reasons discussed above and those argued at Docket 19, pages 10 to 17 and 22 to 26, evidence of guilt is not overwhelming. Furthermore, Meister has established Strickland prejudice because defense counsel's neglect of evidence disproving the confession crippled the false-confession defense. Especially so because Ofshe was prevented from specifically showing how Meister was coerced into confessing} reasonable counsel would have focused on just exactly how Meister confession could not be true. The state did present substantial circumstantial evidence against Meister, but this is all the more reason to present persuasive evidence of false confession, not less of a reason. The jury needed first to be convinced by powerful evidence that the confession was false, before any other defense would gain traction. That is a difficult challenge, and defense counsel's "broad approach" to it, i.e., vague and unsupported by independent evidence, failed "to make the adversarial testing process work in [this] particular case." Strickland, at 690.

B.  Claim Four

Meister testified that he was home with his roommates at the time of the shooting (about 10:15 p.m.) until about 11:00 p.m. when he and roommate Jeremy White decided to drive to Papa John's Pizza after discovering Pizza Pipeline was not answering its phones. (Tr. 3144: 16-21; 3134-36; 3139-40.) White's testimony corroborated Meister's (Tr. 3672-73, 3760-62), and further

PETITIONER'S REPLY THE RESPONDENT'S ANSWER AND BRIEF – 26

that once at Papa John's (still at around 11:00), he and Meister met with

Pipeline worker Joe Rauch (Tr. 3674). The county prosecutor presented evidence

that it would have been physically possible for Meister to flee Hart's trailer

at 10:15 p.m. and follow a direct path to his home by 10:35 p.m., in time

to talk with White about pizza at 11:00 p.m. (Tr. 1606: 8-12.) However,

Meister's confession did not describe a direct path to his home, but rather

a circuitous and broken path around and through the snow-covered fields

of northern Moscow. (Dkt. 10 PT2, Vol. 17 at 3583: 24 – 3584: 5; Tr. 2069,

2071; 3228-29.) The prosecution argued it was, nonetheless, possible for

Meister to return home by 11:00 p.m.:

> Before we get into his testimony, I want to talk about Pizza Pipeline
> that night on December 11th, 2001. Ike Cantrell said he worked his
> regular shift. The place did not close down, even after Shorty left;
> that Joe Rauch stepped--dropped in. And then Troy Saggau--I can never
> pronounce his name, Saggau, Saggau--was called. And Troy told Joe,
> don't close. I'm on my way in. And when he got there, the store was
> open, and it closed at its normal time, 1:00 a.m., just like their
> regulations tell them.
>
> Now, there was a period of time, apparently, when phones weren't
> answered, because when Heather called the Pipeline about 11:00--11:05,
> there was no answer the first time she called. But then there was an
> answer when she called the second time.
>
> We also know that the Sheriff's Office called Pipeline, at Detective
> Mikolajczyk's request, and spoke to Joe Rauch at about--or at 10:59
> p.m. Aric Morgan, if you recall, testified he was getting a tattoo
> over at Falling Moon. He had taken a break. It was kind of a long pro-
> cess. He had gone over to Pizza Pipeline. It was open.
>
> Eric Saueracker testified after his yoga that he went through Pipeline.
> It was open. Eric also testified that the place was open later after
> they got done with the tattoo and they went to the bar, he and Jeremy
> Hogan. Still open.
>
> With the sole exception of Jeremy White, everyone who worked at Pipeline
> or who came through at some point that night, is consistent about one
> thing. The lights stayed on. The doors stayed open until 1:00 a.m.

(Tr. 3970: 20 – 3972: 1.)


PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF – 27

So, approximately 28 minutes with those two combined to walk from the trailer to the defendant's home. Now, that's walking. Obviously, the defendant was running a lot faster than Sergeant Aston was walking it. And if you remember, Vern Grotjohn testified that the span between the footprints was consistent with the defendant running.

So, let's say it took him 20 minutes to run home. That would have put him home around 10:35. But we know that's probably not likely because he did testify that he did take some sort of deviation and he hid for just a little bit of time. But we also know that he--you got to believe that he wants to get home as soon as he can because it looks suspicious out there hiding in the dark.

So, let's just say it took him a half hour. That puts him at 10:45 getting home. Even if you want to give him an extra fifteen minutes of wandering around the neighborhood, that puts him at 11:00 when he got home.

Now, Jeremy White said he was at home on the computers anywhere between 30 to 60 minutes before they called for pizza. He told Hall that that could have been anywhere from 10:00 to midnight when they called for pizza. And midnight is more consistent with what Meister told Detective Westbrook back on August 29th. That gave David plenty of time to kill Tonya Hart and get home for Jeremy White to see him and go for pizza, if that really occurred. Jeremy White does not give David Meister an alibi.

(Tr. 3976: 8 – 3977: 12.)

Now, the alibi, not answering the telephone at Pizza Pipeline. I believe Ike Cantrell testified there was a call. And Rijel Glasebrook is the person who usually stayed in and made the pizzas, and then Ike did the delivery. But there was one where they exchanged. Rijel needed to go pick up something at a friend's house, and so she took one of the deliveries, leaving Ike there to presumably make pizzas and answer the phone.

At that point, he said at some point he--well, obviously, there were some phone calls missed. We know that--well, at least one, one known phone call. Heather Hart called at 11:05, and it wasn't answered; but she called again, and it was answered. Does that mean that there was this big long hour or so of time where the phone wasn't answered? There's no proof of that.

(Tr. 4060: 24 – 4061:15.)

Defense counsel's counter argument in closing was that Meister and

White resorted to Papa John's after being unable to place an order at Pizza

Pipeline by phone, and argued evidence from Ike Cantrell corroborated Pipeline

closing early for awhile that night:

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 28

> Now, there's been lots of discussion about whether Pizza Pipeline was
> open or closed in this timeframe. I don't know. I think Ike Cantrell
> said maybe there was some talk about. Maybe they started making some
> motions towards closing it.

(Tr. 4033: 22-25.) However, far more persuasive evidence existed about Pipe-
line's temporary closure that night, than Cantrell's vague memory.

At the first trial, Cantell's coworker that night, Rijel Glasebrook,
confidently testified that Linderman left Pipeline at about 10:30 p.m. (2003
Tr. 2754, 2771 ["2003 Tr." refers to the 2003 Trail Transcript which begins
at dkt. 10 PT2, Vol. 6 at 1263] ); Linderman soon called back to Pipeline
to tell Rijel to find Joe Rauch to close up because he had keys to Pipeline
(id. at 2756: 19-20; 2757: 11-18); Ike and Rijel decide to stop answering
phones and Ike leaves to go go find Joe Rauch (id. at 2756: 7-17; 2757:
11-17; 2772-73); Joe arrives at Pipeline and decides to start closing the
store (id. 2756); Joe was already at Pipeline (id. 2763, 2770) when Rijel
goes on a pizza delivery at about 10:50 p.m. (id. at 2774); when Rijel returns
from the delivery, she calls Pipeline's manager at his home, who instructs
to keep Pipeline open, and so Pipeline workers begin taking calls again
(id. 2756: 23 - 2757: 4; 2764-65); phones are being answered by 10:59 p.m.
when Joe takes a call from a LCSO Dispatcher (Tr. 1392), and another from
Heather Hart at about 11:05 (Tr. 845). This is powerful evidence Pipeline
temporarily closed and its workers stopped answering phones between 10:42
p.m. (documented time of a pizza order; Tr. 4034: 2) and 10:59 p.m. (logged
call from LCSO Dispatch). Defense counsel was objectively unreasonable to
not present it because it corroborates Meister's and White's testimony and
does not detract from the alibi or any other defense in any conceivable
way.

In addition, had counsel been reasonable, they would have presented

evidence from Joe Roach that he encountered Meister and White at the Papa

John's parking lot (dkt. 1-1 at 30-31; dkt. 10 PT2, Vol. 19-20 at 3987-88,

4314) and presented evidence from Rijel that proved that encounter occurred

between 10:42 and 10:50 p.m. because Joe was already at Pipeline at 10:50

when Rijel left for a delivery (2003 Tr. 2763, 2770) and could not have

been after because Joe did not leave Pipeline until about 1:00 a.m. (2003

Tr. 2763).

Professionally competent defense counsel would not have ignored that

evidence and left the door open for the prosecution to argue Meister could

have returned home from the shooting as late as 11:00 p.m. Evidence that

Joe Rauch (and likely Ike Cantrell, as well (2003 Tr. 2756; 2011 Tr. 3141,

3674: 4-6)) encountered Meister and White at Papa John's prior to 10:50

p.m. constructively places Meister at home easily before 10:45 p.m., necessar-

ily factoring in time to place an unanswered call to Pipeline and to after

travel to Papa John's by 10:50.

As with Claim Three, the Idaho Court of Appeals and the state, currently,

argue that defense counsel's decision not to present alibi evidence was "strate-

gic" and so acannot be challanged, but also that defense counsel's actions

were reasonable because of "hindsight" gained from the first trial. (Dkt.

28 at 25-26.) However, as with their argument against Claim Three, their

rationalizations for defense counsel's conduct are base on speculation unsupp-

orted by the reocrd or a reasonable application of Stickland's presumption

prong. For the reasons briefed at length herein regarding Claim Three, this

Court may execute de novo review of Claim Four.

In addition, this Court should grant relief, in accord with Ninth Circuit

precedent: In Alcala v. Woodford, our Circuit Court applied Stickland and

found that although counsel made a strategic decision to present an alibi, counsel was nonetheless objectively unreasonable for failing to present the defense adequately. 334 F,3d 862, 869-73 (9th Cir. 2003).

Alcala's counsel presented four witnesses who testified Alcala could have been at Knott's Berry Farm during the time the victim disappeared from Hunington Beach, but who were vague about the specific time frame in dispute. Id. at 870. Similarly, Meister's counsel presented testimony from Meister and White that Meister was home around the time of the murder, but their testimony was also vague about whether Meister was home prior to 11:00 p.m., the time frame in dispute. At closing arguments in Aclala's trial, the prosecution highlighted the vague alibi evidence. Id. at 869-70. The prosecution in Meister's case did so as well. (Supra.) In Alcala's case, defense counsel had access to alibi evidence of the specific time frame in dispute, but failed to present it. Id. at 870. Meister's counsel, too, had access to alibi evidence from Glasebrook and Rauch, but did not use it. In Alcala, the Ninth Circuit concluded defense counsel were incompetent because even "if Alcala's trial counsel did offer a [strategic] basis for his decision not to present alibi evidence, that basis would be unreasonable if it were unsupported by objective evidence because [the omitted evidence was] consistent with the alibi defense that counsel chose." Id. at 871. Consistent with Alcala, the alibi evidence from Glasebrook and Rauch was "consistent with the alibi defense that counsel chose," and there is nothing in the record to objectively undermine the alibi evidence. Counsel's performance was, therefore, constitutionally deficient because "[a]bsent an objectively reasonable basis to undermine the credibility or utility of [Glasebrook's or Rauch's testimony], a competent attorny would not have failed to put on this evidence." Alcala, at 871.

Lastly, the state acknowledges that the Idaho Court of Appeals affirmed the dismissal of Claim Four without specifically referring to Strickland's prejudice prong, but nonetheless asks this Court to deny Claim Four because evidence of Meister's guilt is overwhelming. (Dkt. 28 at 26.) For the reasons discussed above and those argued at Docket 19, pages 10 to 17 and 22 to 26, evidence of guilt is not overwhelming. Furthermore, Meister has established Strickland prejudice because defense counsel neglected evidence that firmly placed Meister at home prior to 10:45 p.m., which is fifteen minutes outside the prosecutions 11:00 p.m. time frame for Meister to have returned home from the shooting. Defense counsel prejudiced Meister's alibi defense because "the addition of [Glasebrook's and Rauch's] testimony may [result] in a different verdict because it was consistent with [the defendant's] account and would have created more equilibrium in the evidence presented to the jury. This is so because the testimony butressed [the defendant's] account on this crucial point [of alibi]." Luna v. Cambra, 306 F.3d 954, 961-62 (9th Cir. 2002) (holding absence of alibi testimony prejudicial despite vagueness because evidence nonetheless compatible with defendant's testimony).

C. Claim Five

1. Claim Five(A)

Meister alleges counsel were deficient for eliciting evidence that Linderman's phone number was found in Meister's wallet. (Dkt. 1-1 at 34-38.) The county argued at summary dismissal that defense counsel mitigated the blunder by suggesting during cross-examination that Meister and Linderman were coworkers and to have the other's phone number is not probative of guilt. (Dkt. 28 at 29.) The state post-conviction court did not comment upon the county's argument, but did agree that Meister had not shown counsel's performance to be objectively unreasonable, and noted that although defense

raised the subject, the evidence was not highlight. (Dkt. 10 Pt2, Vol. 21 at 4467.) The Idaho Court of Appeals affirmed on these grounds and added that defense counsel were aware of the potential risks and objected to the prosecution's questioning of the witness about the phone number. (Dkt. 10 PT1, #9 at 34-35.)

As to that last, it is based on an unreasonable determination of fact. (§ 2254(d)(2).) Defense counsel did not object to the <u>substance</u> of the prosecutor's questioning, but only to its <u>form</u>, that it was "leading." (Tr. 2000: 5-9.) Furthermore, the Idaho courts' finding that the evidence was not "highlighted" by either the defense or prosecution supports that it was unreasonable to bring it up in the first place, and unreasonably ignores the evidence's significance in two important ways: First, the evidence--by all appearances to the jury--unequivocally corroborated Meister's confession; there is no other point in the confession so conclusively established. (Tr. 1950-52; 2152-74.) Second,, this evidence is <u>the only</u> physical evidence potentially establishing conspiracy between Linderman and Meister. (2003 Tr. 3345: 21-22.)

The Idaho courts' speculation, in addition, that the jury were probably inattentive and missed the evidence ignores the evidence's context and play with other evidence: Meister's recorded confession that the phone number would be found in his wallet was played at trial twice (Tr. 2090, 3391-92); the jury was given transcripts of the confession to follow along with (Tr. 2090); defense counsel questioned the detective at length about his search of the wallet after Meister's arrest and photo exhibits of the contents of the wallet were admitted (Tr. 1969-71); the prosecution elicited that Linderman's phone number was, in fact, found in the wallet (Tr. 1999-2000); the defense brought this up again to suggest it is normal for coworkers

to have each other's number (Tr. 2003: 19-25); and it was the jury's duty
in deliberations to review the audio and/or transcript exhibits of Meister's
confession about the phone number (Tr. 2089-90) and review the photo exhibits
of the wallet's contents (Tr. 1971).

The state argues that the defense exhibits of the wallets contents
do not actually contain Linderman's phone number. (Dkt. 28 at 29.) However,
the point is irrelevant because no one ever testified to what Linderman's
number actually was; any number in Meister's wallet could then be from Linder-
man, for all the jury knew. Moreover, supposing the jury did discover the
discrepancy in the exhibits and trial testimony about the wallet's contents,
it is all the more reason to believe the jury were reminded of the detective's
statement that Linderman's phone number was found in Meister's wallet.

The record clearly indicates the phone number evidence was not as for-
gettable as the Idaho courts' say. Idaho's determination of the facts is
not supported by the trial record. (§ 2252(d)(2).) Moreover, the Idaho courts'
proposition that the matter, in any case, is strategical and thus cannot
be challenge is based on an unreasonable application of Strickland, as dis-
cussd above in section V. Unreasonable Application of Strickland v. Washing-
tion, which argument is hereby incorporated by reference. Notably, the Idaho
courts and the state, currently, offer no rationale or evidence to support
a strategy for defense counsel to bring up the wallet search and phone number.
How was that evidence supposed to support a defense?

Rather, competent defense counsel would have AVOIDED altogether the
fact that Meister possessed Linderman's phone number, for obvious reasons.
But once that evidence came out, competent counsel would have undercut it
with evidence that the number could not have been given out on the night
of the murder (as Meister confessed it was) because it did not exist at

that time, and then would have argued in closing that this evidence actually supports Meister's testimony that he improvised a false confession upon interrogators' lead and available circumstances. (Tr. 3431-59.) The Idaho Court of Appeals reasoned counsel likely did not present that evidence and argument in order to avoid the subject that Linderman's number was in Meister's wallet. That argument, however, ignores the fact that defense counsel brought up the subject of what was found in the wallet. The Strickland performance prong is satisfied because it is objectively unreasonable for counsel to have raised the subject to begin with and then utterly fail to mitigate its prejudicial impact with available evidence.

For the purposes of Strickland's second prong, the prejudice caused by counsel's failure was unchallenged proof that Linderman's number was given to Meister on the night of the shooting, in furtherance of the conspiracy, as Meister's confession attested, and that the number was found in Meister's wallet, as the confession said it would be. That is what the jury actally heard. There is no reasonable excuse for that error, and it is therefore at least prima facie proof of defense counsel's incompetence. The Court of Appeals' and the state's secondary argument that, regardles of the error, prejudice cannot be shown because of overwhelming evidence of Meister's guilt is wrong in fact and reason, for the reasons already briefed herein.

2. Claim Five(B)

Meister alleges counsel were deficient for introducing prejudicial bad-character evidence. (Dkt. 1-1 at 39-40.) As Meister's second trial approached in 2011, Duane Scott made new allegations that, sometime around the date of the murder, Meister was dressed in dark clothing and said he was going to do "dirty business." (Tr. 1763.) The trial record clearly indicates that defense counsel questioned former detective Kurtis Hall about his inter-

views with Scott, to highlight that Scott never previously mentioned "dark clothing" or "dirty business." Hall's report of the first of these prior interviews contained Scott's statement that Meister "had a sick sense of humor and would talk and laugh about things that were gory, blood or inappropriate to a conversation." Defense counsel twice quoted Scott's comment from Hall's report. (Tr. 1838-1839.)

The Idaho Court of Appeals affirmed the state post-conviction court's summary dismissal of the claim. (Dkt. 10 PT1, #9 at 35-37.) The court first reasoned it was not objectively unreasonable to try to discredit Scott with prior interviews in which he did not mention Meister's dark clothes or "dirty business" comment. The court then reasoned, "by pointing to Meister's sense of humor and the statements that he was 'invloved in something dirty' could have been an attempt by counsel to depict Meister's statement as not being serious but as being humorous." (Id. at 37.)

The court's second point is impermissible speculation about counsel's decision making and is not supported by evidence in the record. (§ 2254(d)(2); Richter, supra.) Rather, the record shows that Meister did not testify that he made the "dirty business" comment to be humorous; he testified that he did not make the comment at all, and that Scott was lying. (Tr. 3357.) It would be objectively unreasonable for defense counsel to suggest Meister did make the comment but was joking, because that suggestion would discredit Meister's trial testimony. Additionally, the record shows that it was counsel's position that Scott was lying (Tr. 1769: 6-11); and counsel argued, not that Meister made a joke, but that Scott fabricated the comment (Tr. 4036: 14 - 4037: 3). Lastly, defense counsel moved in limine to have these specific comments by Scott excluded, and the motion was granted. (Tr. 1731-1733.)

Counsel's motion to exclude Scott's comments contradicts the Idaho Court of Appeals' ad hoc finding of defense counsel's decision to impeach Scott with the prejudicial comments. Furthermore, Hall could have testified to his prior interview of Scott without also getting into Scott's disparaging statements. It was not necessary for counsel to quote the prejudicial evidence in order to question Hall about the dates he interviewed Scott and whether Scott on those dates said anything about "dark clothes" or "dirty Business." Counsel's introduction of the bad-character evidence was, therefore, useless to pursue the otherwise reasonable tactic to discredit Scott with prior interviews. As such, it is objectively unreasonable and prima facie proof that counsel's quotation of Scott resulted from inattention while refreshing Hall's memory and orienting him to a particular section of his report. (Tr. 1838-39.)

In support, this Court is referred to the precedent of Sager v. Maass, 907 F.Supp. 1412 (D.Oregon 1995) in which case defense counsel was found to be objectively unreasonable (despite his purported strategy) for intro-ducing prejudicial evidence that was both avoidable and unnecessary to further a defense. Meister acknowledges the magnitude of prejudice resulting from the introduction of the entire victim impact statement in Sager is distinct from the lesser prejudice of the bad-character evidence defense counsel introduced against Meister. Sager is here cited chiefly to oppose the state's insistence that "strategy" cannot be per se challenged under Strickland. Meister concedes that a different outcome at trial probably would not have occurred, absent the error alleged in this subclaim. However, counsel's inexplicable introduction of evidence that prejudiced Meister with a general bad character of someone who enjoys things associated with violence and death and, thus, possibly is a person who could commit murder for hire,

is objective proof that counsel was not operating at the level of profes-
sional normes required in a close case (when mistakes matter most) and with
the stakes involved in a first-degree murder trial. This Court may then
factor the error and prejudice of subclaim Five(B) into the larger picture
of IAC stated in Meister's claim of cumulative error (Claim Seven).

D. Claim Six

1. Claim Six(A)

Claim Six(A) is hereby withdrawn.

2. Claim Six(B)

The prosecutor asked defense witness Brian Keim, "Isn't it true that
the Odinistic belief is that sin is denied and contrition denounced, that
Odinists see repentance as a mark of weakness?" (Tr. 3613: 17-19.) The prose-
cutor then suggested that Keim would be appreciated by Odinists for helping
Meister get away with murder because "Odinism doesn't see repentance--or
sees repentance as a mark of weakness? (Tr. 3622: 4-14.) The Idaho Court
of Appeals determined that defense counsel were not deficient for failing
to object to the prosecutor's questions, because (1) the questions went to
potential bias, and (2) the trial court denied a motion for new trial based,
in part, on the religious commentary, so there is no evidence the trial
court would have sustained an object to the remarks at trial. (Dkt. 10
PT1, #9 at 26.) However, the state appeals court's decision was based on
an unreasonable determination of facts (§ 2254(d)(2)) and/or an unreasonable
application of Supreme Court law (§ 2254(d)(1)).

After extensive proffer, the trial court permitted the prosecution
to examine Keim's potential bias through his association with Meister in
prison and religious services and through the Odinic Nine Noble Virtue's
concept of "Loyalty"--"so, I would allow the State to examine as they have

examined Mr. Keim in this offer of proof." (Tr. 3578: 23-24.) The Idaho
Court of Appeals' analysis of the trial record completely missed that the
prosecutor's representation about the "Odinis i belief" regarding sin,
contrition, repentance, and that Keim would look good for helping Meister
was not part of the proffer. (Tr. 3565-78.) Contrary to the appeals court's
determination of the facts, the trial court did not permit the prosecution
to explore bias by remarking on the supposed "Odinistic belief." And yet,
even had the trial court so permitted, that would have been an abuse of
discretion to admit the evidence because the nature of the questioning was
both "unduely prejudicial" (IRE 403) by implying Meister, as an Odinist,
lacked conventional morals (and so could be of a type who could kill for
money) and suggesed Keim and Meister were less credible by virtue of their
religion (IRE 610). It is also impermissible for the trial court to permit
the prosecution to use the content of a witness's religion to impugn their
character and credibility, and to hold otherwise is unreasonable because
the First and Fourteenth Amendments "prevent [the prosecution] from employing
evidence of a defendant's abstract beliefs . . . when those beliefs have
no bearing on the issue being tried." Dawson v. Delaware, 503 U.S. 159,
167 (1992).

Furthermore, evidence in the record indicates that the prosecutor's
representation about Odinistic denial of sin, contrition, and repentance
was an "improper method[] calculated to produce a wrongful conviction" (Berger
v. U.S., 95 U.S. 78, 88 (1935)) by "appeal[ing] to the passions, fears and
vulnerabilities of the jury," which is, of course, proscribed by law. U.S.
v. Weatherspoon, 410 F.3d 1142 (9th Cir. 2005). First, there is no foundation
in the evidence that Odinism even has beliefs about sin, contrition, and
repentance as the prosecutor represented. (See generally Tr. 3553-81.) How

can one purport to explore bias from a particular belief in a religion,
when that particular belief is not actually a belief in the religion? [It
is worth noting that the prosecutor's representation about the "Odinistic
belief" is, in fact, an untrue representation. (Tr. 3613-14, 3622; Dkt.
1-1 at 44: 26 - 45: 4.)] Second, the prosecutor's inappropriate motivation
is evinced by the fact that she did not make the "sin, contrition, repentance"
comments during the proffer to the judge, but instead waited to spring them
for the first time in front of the jury.

 The trial court did deny defense counsel's motion for new trial based
in part on the prosecutor's comments, but the Idaho Court of Appeals has
unreasonably determined that this fact is evidence that the trial court
would not have sustained an objection in the course of trial. This is so
because the trial court denied the motion for new trial, in part, because
the error was not sufficient cause to warrant a whole new trial--but it
did not find that the comment was appropriate. (Dkt. 10 PT2, Vol. 21 at
4582; 4610.) The appeals court also ignored that the trial court did sustain
a later motion to preclude the remarks from closing arguments: "I do certainly
agree that you cannot argue because a witness or otherwise may be a member
of that particular religion, their credibility should be questioned or weighed
in some respect based on that religion membership." (Tr. 3948: 1-5.) "The
[court] will grant the motion as to Subpart[] 3. . . ." (Tr. 3947: 19-20.)
Subpart 3 is captioned "The State should be precluded from including the
words 'sin' and 'repentance' in its closing argument in any form, and the
State should be precluded from implying that the religious notions of 'sin'
and 'repentance' has any bearing on the outcome of this proceeding what-
soever." (See Motion In Limine Regarding Prosecution Closing Arguments,
pages 4 and 5 (provided herewith as Attachment A).)

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 40

The record indicates that the trial court would have sustained the objection had it been made in the course of trial. Reasonable and attentive defense counsel would have objected to the prosecutor's line of questioning of Keim as soon as it deviated from the substance discussed at the proffer (Tr. 3613: 16-17), prior to the prosecutor saying anything about "sin," etc.; and at the very least should have moved to strike at the first mention about the "Odinistic belief." Counsel's failure to do so is prima facie proof of neglect (serving no reasonable strategy) and caused Strickland prejudice because the prosecutor's suggestions colored Keim and Meister as deviants unworthy of belief by virtue of their shared religion. Meister's First Amendment right, additionally, was impacted because the State of Idaho used that expression and association as a basis to convict Meister for a crime (for which violation there is no harmless-error analysis).

   3.  Claim Six(D)  [Claim Six(C) is combined with Six(E), below.]

   The Idaho Court of Appeals affirmed the lower court's summary dismissal of Meister's post-conviction claim that counsel were deficient for failing to object to repetative rebuttal testimony in favor of the prosecution. (Dkt. 10 PT1, #9 at 26-27.) The appeals court held Meister failed to rebut the presumption that counsel acted reasonably "to determine appropriate challenges and to avoid those which are either unlikely to be granted or to avoid objecting overzealously, . . . especially if the evidence was not unduly prejudicial as it was here." (Id. at 27.)

   The problem with that decision is that the appeals court actually knew nothing about whether that reasoning was part of defense counsel's decision making at all. Counsel was not permitted to testify about that process, and there is nothing in the record from which to derive evidence of counsel's decisions in this instance. Additionally, for the reasons discussed in

section V. above, the appeals court reads <u>Strickland v. Washington</u> too
narrowly and so is an unreasonable application of Supreme Court law. The
court's prejudice analysis, as well, is faulty for the reasons discussed
at section VI. above, and because it fails to examine the significance of
the repetitive testimony in context of the trial. <u>Kotteakos v. U.S.</u>, 328
U.S. 750, 764 (1946) ("This must take account of what the error meant to
[the jury], not singled out and standing alone, but in · · · relation to all
else that happened.").

That context is here provided: In its case-in-chief, the prosecution
presented LCSO Detective Hall and ISP Detective Westbrook to testify about
the unrecorded circumstances of Meister's August 29, 2002 interrogation.
(Dkt. 1-1 at 52.) The officers each testified (1) Meister received a full
<u>Miranda</u> warning, (2) Meister did not appear to be under influence of drugs,
but was alert and lucid, (3) interrogators did not mention the shooter was
seen wearing a yellow plaid shirt, and (4) interrogators did not mention
the death penalty. (<u>Id</u>. at 52.)

Meister testified in his defense that he did not receive the full <u>Miranda</u>
warning, had consumed opiates prior to the interrogation, was told the shooter
wore a plaid yellow shirt (and so incorporated a similar detail into his
false confession), and was threatened with the death penalty if he did not
confess. (Dkt. 1-1 at 46-48.)

The prosecution later had Hall and Westbrook testify at rebuttal that
(1) a full <u>Miranda</u> was given, (2) Meister was alert and lucid, (3) a yellow
shirt was never mentioned, and (4) the death penalty was not mentioned.
(Dkt. 1-1 at 53.)

Had counsel objected to that rebuttal, the trial court should have
sustained because the scope of rebuttal does not permit the prosecution

to retry its case-in-chief. See e.g. U.S. v. Papia, 560 F.2d 827, 847-48 (7th Cir. 1977). Although the officers' testimony was offered for impeachment purposes, which abstractly is permissible rebuttal, their testimony nonetheless offered nothing new nor clarification beyond what was elicited in the prosecution's case-in-chief. Had counsel objected or moved in limine on this basis, the trial court should have sustained under IRE 403 for the prosecution "needlessly presenting cumulative evidence."

Reasonable defense counsel also would have moved in limine to exclude the cumulative rebuttal under Rule 403 as unfairly prejudicial: The only direct evidence of coercion was Meister's testimony itself (Dr. Ofshe having been precluded from discussing the coercion of Meister). Cetainly the detectives' contradictory evidence was admissible in the case-in-chief, but it was nonetheless fundamentally unfair to bolster the detectives' version over Meister's version by use of repetitive testimony. The Strickland prejudice was the prosecution's fundamentally unfair attack on Meister's credibility generally, but, more importantly, specifically regarding the dispute around the unrecorded interrogation and the circumstances Meister claimed resulted in his false confession. In other words, the prejudice was to the key defense.

The state criticizes Meister's argument by asserting he "did not identify any particular portions of testimony which were cumulative and unfairly prejudicial." (Dkt. 28 at 44.) That is simply untrue. Pages 52 to 53 of Petitioner's Declaration in Support of Petition for Writ of Habeas Corpus (Dkt. 1-1) detail how the detectives' rebuttal was identical to their case-in-chief testimony; and citation to the transcript record is given. [It appears that this portion of the Declaration was mislabelled to refer to subclaim 6(E) (see Dkt. 1-1 at 52); it should be labelled 6(D).] Moreover,

the particular portions of    testimony which were cumulative and unfairly
prejudicial were cited at the state post-conviction stage (Dkt. 10 PT2,
Vol. 18 at 3941-44) and state appeal (Dkt. 10 PT1, #15 at 35-36).

    4.  Claims Six(E) and (C)

    Subclaim Six(C) regarding the prosecutor's inappropriate closing argument
against Meister's credibility is hereby withdrawn, with the exception of
the prosecutor's inappropriate argument that, regarding the circumstances
of Meister's interrogation, between law enforcement and Meister, "[W]ho
has the most incentive to be dishonest about what happened?" (Dkt. 1-1 at
46: 14-18.) Claim Six(C) is therefore abrogated. Subclaim Six(E) alleges
the prosecution's argument that, "Mr. Meister tailored his testimony [the
Dr. Ofhe's], his hired expert," was unfairly prejudicial. (Dkt. 1-1 at 46:
18-24.) Subclaims Six(E) and (C) are combined here for convenience. [It
appears the facts alleged in support of subclaim 6(E) were stated in the
facts supporting subclaim 6(C) without appropriate demarcation; the facts
alleged in support of subclaim 6(E) in Petitioner's Declaration in Support
of Petition for Writ of Habeas Corpus appear at page 46: 22 - 51: 2.]

    The Idaho Court of Appeals affirmed the summary dismissal of Meister's
claims based on these comments from the prosecutor. (Dkt. 10 PT1, #9 at
31-33.) In so doing, the court quoted the prosecutor's argument regarding
the unrecorded August 2002 interrogation of Meister: "It's too bad [the
entire] interview wasn't recorded. But that doesn't mean that you can't
weigh the testimony of [the officers] against that of [Meister's]. That's
within the province as jurors to do so." (Id. at 32.) Because this argument
was not a specific reference to the credibility of the officers, the appeals
court held it was proper closing argument. (Id. at 31-32.) But that assertion
is based on an unreasonable determination of fact because it entirely ignored

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 44

the prosecutor's subsequent statement: "[Y]ou can[] weigh the testimony
of [the interrogating officers] against that of Mr. Meister. . . . Again,
who has the most incentive to be dishonest about what happened? Mr. Meister
tailored his testimony to [Dr. Oshe's], his hired expert." (Tr. 4069: 13-
18.)

In light of all the facts, it is clear the prosecutor's argument boils
down to "the accused has more incentive to lie than law enforcement," which
is a comment that law enforcement are innately more credible. That under-
standing is borne out by the prosecutor's statement that Meister lied about
the circumstances of the interrogation to fit them to Ofshe's theory of
coercive tactics. (Tr. 4069: 18.) The appeals court, unreasonably, did not
analyze the propriety of that argument. (Dkt. 10 PT1, #9 at 31-32.)

That argument is important because the officers' potential incentive
to lie (to avoid suppression of the confession based on police coercion)
was not in evidence whatsoever, and because Meister's potential incentive
to lie (to support his defense that the confession was false and coerced)
is not a comment on the evidence of guilt, but rather is purely a comment
about credibility. The prosecutor was clearly making a credibility comparison
between the police uniform and the inmate orange jumpsuit, so to speak,
which is an unfair appeal to the imprimatur of the detectives' office. See
e.g. State v. Gross, 189 P.3d 477, 482 (Idaho Ct. App. 2008). Had defense
counsel objected to the inappropriate argument, the trial court should have
sustained because "credibility is a matter to be decided by the jury, and
prosecutors have been admonished time and again to avoid statements that,
if the defendant is innocent [or honest], the government agents must be
lying." U.S. v. Sanchez, 176 F.3d 1214, 1224 (9th Cir. 1999).

The appeals court was also unreasonable in its finding that the

prosecutor's statement that Meister lied to support application of Ofshe's
theory was properly based on evidence. (Dkt 10 PT1, #9 at 32.) Again, the
appeals court mistakes the facts. (§ 2254(D)(2).) First, the prosecutor's
statement is a bald opinion in the context of the closing argument—her
statement that Meister tailored his testimony is neither proceeded nor suc-
ceeded with a discussion of evidence indicating Meister's testimony was
false about the interrogation. (Compare Tr. 4067-68 with 4070.) Although
a prosecutor may give an opinion as to the truth or falsity of testimony
when based on the evidence, the prosecutor "should explicitly state that
the opinion is based solely on inferences from the evidence presented at
trial." (Dkt. 10 PT1, #9 at 30 (citing State v. Phillips, 156 P.3d 583,
587 n.1 (Idaho Ct. App. 2007).) In this case, there was no discussion of
evidence nor explicit statement of inference.

Second, although the prosecutor in closing did elsewhere discuss evidence
that could support an inference that Meister was not credible, it was remote
from the comment in dispute and was, nonetheless, distinct from any evidence
indicating Meister "tailor his testimony [to Dr. Ofshe's]." There is no
discussion anywhere in the prosecutor's closing about how Meister was supposed
to have tailored his testimony. This is necessarily so because Meister's
2011 testimony about police influence that caused him to confess falsely
is consistent with his 2003 testimony, which proceeding took place long
before Ofshe was involved in the defense. (See Dkt. 1-1 at 46-50 for compar-
ison of Meister's testimony.) Had defense counsel objected to the comment,
the trial court should have sustained on the grounds of improper opinion
about credibility and a misrepresentation of the evidence at trial.

The prosecutor's inappropriate comments caused prejudice for the purpose
of Strickland because they unfairly deminished Meister's key defense that

he was coerced into confessing falsely. Defense counsel's failure to make

the sustainable object regarding the prosecutor's inappropriate attack on

Meister's credibility regarding the key issue reveals no reasonable strategy,

and as such is prima facie proof of inattention or neglect during closing

arguments.

    5. Claim Six(F)

The argument in dispute is as follows:

> Now, the defendant is entitled to many rights, the presumption of inno-
> cence, a trial by jury. The Court carefully reviews evidence to make
> sure everything you hear is proper for your consideration; that it's
> relevant; that it's not overly prejudicial. It's a very careful process,
> and it should be. It's designed to carefully protect the rights of
> the defendant. And that's what we in our society want.
>
> However, Tonya Hart had no such process. The defendant didn't give
> her any presumptions or protections. With two shots, he acted as her
> judge, jury, and executioner without due process of law. But this time
> it's different because you can stop him. It's unpleasant—as unpleasant
> and difficult as it can be to render judgment, to look the defendant
> in the eye and say he's guilty, that's what the evidence compels you
> to do.

(Tr. 4015: 16 - 4016:7.) [It appears that the facts alleged in support of
subclaim 6(F) were mistakenly labelled 6(D) in the declaration in support
of the petition (Dkt. 1-1 at 51); page 51 of the supporting declaration
actually supports subclaim 6(F).]

    Meister alleges the second portion of the argument was inflammatory

and should have been objected to at trial. The Idaho Court of Appeals affirmed

the summary dismissal of that claim because the prosecutor properly summarized

"that  society wants Meister to have a fair trial," and that her other argu-

ment "pointed to the evidence in asking for a conviction." (Dkt. 10 PT2,

#9 at 34.)

    This Court can read the argument for itself, and clearly see the appeals

court's factual determination was unreasonable. (§ 2254(d)(2).) The prose-

cutor's use of the transitional adverb "however" belies the appeals court's

interpretation that the prosecutor was merely reminding the jury of what

society wants in a criminal trial. Rather, "however" literally means "in spite of that" (Webster's) and suggests the prosecutor highlighted Meister's trial rights to the jury (many of whom were aware of Meister's first trial, appeal, and remand for second trial) to implicate what many would view as an unfair dichotomy between the rights of the accused and the rights of the victim. This is certainly the prosecutor's point when she say, Hart "had no such process," and Meister "didn't give her any presumptions or protections."

The appeals court's further finding that the argument is a permissible comment on the evidence is entirely unreasonable. It is nonsense. There is no mention of particular evidence, only a plea that the jury "say he's guilty, that's what the evidence compels you to do." To the contrary, that statement is preceded by a plea that the jury "stop him" because he did not give Hart "due process" or "presumptions," or "protections." The statement is not a discussion of evidence or an inference from evidence pertaining to guilt or credibility. The statement is not even an argument as such; it is inflammatory rhetoric.

The state asks this Court to presume defense counsel had a reasonable strategy to forego objection in this instance in order to avoid highlighting the matter. (Dkt. 28 at 33-34, 48.) First, that is speculation; there's no evidence regarding counsel's decision making in record. Second, the prosecutor's argument does not discuss any evidence defense counsel would be wise to avoid. And third, counsel knew the statement would likely be made and could have moved in limine to exclude it.

The prosecutor's closing argument in 2011 closely followed the prosecutor's closing argument from the first trial in 2003. (2003 Tr. 3259-60.) Counsel's failure to move in limine is prima facie evidence that they did

not adequately review the 2003 trial transcripts, which reasonable counsel would have been compelled to do under ABA Rule of Professional Conduct 1.1: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation necessary for the representation." (Emphasis added.)

Meister concedes that this error alone is insufficient to demonstrate Strickland prejudice, but urges this Court to factor the deficient performance into the larger IAC claim brought under allegation of cumulative error (Claim 7) and view the error of subclaim Six(F) as further proof of counsel's unprofessional conduct.

E. Claim Seven

The state argues that, if error occurred, the "alleged deficiencies . . . would not easily cumulate together to create prejudice." (Dkt. 28 at 52.) But that is incorrect. Meister's claim of cumulative error is not merely a catch-all afterthought or hedge to a series of weak claims. Rather, in this case is exemplified the purpose of the cumulative-error doctrine and the way in which errors may combine and compound into an error greater than the sum of its parts. To whit:

Pertaining to the charge of Conspiracy, the prosecution presented evidence of (1) Meister's confession that Linderman asked him to kill Hart because he had tried to separate once and she became very distressed; (2) evidence of a breakup in Spring 2001 and Hart's emotional distress; (3) Meister's confession that he received Linderman's phone number on the night of the murder, and that the number was found in Meister's wallet; (4) testimony from a police officer that Linderman did not seem to show appropriate emotion at the news of his girlfriend's death; and (5) other witnesses who claimed Linderman did not appear to be as upset as was called

for by the situation (Tr. 1106-15; 1124-30).

Had the jury NOT heard about Linderman's phone number being found in Meister's wallet (Claim 5(A))    and instead heard evidence that Meister actually possessed no more knowledge about Linderman and Hart's breakup in Spring 2001 than did other Pizza Pipeline employees (Claim 3(B)), the jury would have had more reason to believe Meister's testimony that he did not conspire with Linderman, and plausibly could have ground to find reasonable doubt that an agreement existed between Meister and Linderman. This is so because the case for conspiracy was especially weak. The prosecution has even concede, "There, I would have to acknowledge, is not a lot of evidence about Jesse Linderman's motive." (2003 Tr. 3345: 21-22.)

The balance of the pertinent evidence militates for reasonable doubt as to conspiracy: Hart and Linderman's relationship appeared to be going well in the months prior to the shooting. (Tr. 832, 875.) Witnesses said Linderman did appear upset over Hart's death. (Tr. 965-66, 1082, 1091-92, 2506-07.) Linderman proposed marriage to Hart one month before the shooting. (Tr. 3650-51, 3653-56.) Linderman appeared to lack foreknowledge that Hart would be killed the night of December 11, 2002--he left his drug money and drugs in proximity where they could be found and confiscated by investigators. (Tr. 1421-22, 1975-84.) Linderman was twenty years old and Hart was twenty-one, with no significant shared assets, no children, and had only been in a relationship for about two-and-a-half years. The two were not inextricably bound together, and the jury could easily have found reasonable doubt that Linderman plotted Hart's death with Meister to end a bad relationship. (It is worth noting that Linderman has never been tried for his alleged involvement in Hart's death and remains free to date.)

Without a conspiracy, the prosecution has no proof of motive for Meister

to kill Hart: At the time of the murder and alleged conspiracy, Meister
was employed (Tr. 3075), generally a diligent worker (Tr. 2838), and actively
pursuing his chosen career path as a professional tattooist, by, among other
avenues, drawing tattoo art for use in the vocation (Tr. 3071: 24 - 3072:
4) and soliciting formal apprenticeship with established local tattoo artists
(Tr. 3063-64, 3070-71, 3082-84). Meister lived frugally but adequately,
with no major debts and having money for his needs and small regular expenses
of only about $270 monthly. (Tr. 3073.) Meister was eighteen years old, with
simple interests in skateboarding, tattooing, and enjoying the occasional
house party. (Tr. 3076-78.) As a person, he was modest in character (Tr.
2381: 20-21) and trustworthy (Tr. 2868: 13-22). And, significantly, he did
not know Hart. (Tr. 3127: 9-21.)

Furthermore, had improper evidence that Meister practiced a pagan reli-
gion that "denies sin, denounces contrition," and "sees repentance as weak-
ness" been excluded (Claim 6(B)), and had improper evidence that Meister
"had a sick sense of humor" and delighted in things "gory" and "bloody"
not been presented (Claim 5(B)), the jury would have had no reason to conclude
Meister was the type of person who would kill for money.

Meister, however, did confess to the murder. Defense counsel did argue
in closing that the prosecution was unable to conclusively prove the confes-
sion true, and yet counsel did not present evidence at trial that actually
disproved the confession. Had counsel presented the available evidence that
the confession cannot be true in view of the objective case facts (Claim
3(A)-(F)), a reasonable jury would have been alarmed by this flaw in the
prosecution's case, and would then have been more receptive to Dr. Ofshe's
testimony generally about interrogation tactics known to cause false confes-
sions.

Consistent with Ofshe's testimony, Meister testified that his interrogators induced a false confession through the use of coercive tactics. The prosecution unfairly repudiated that evidence by using repetitive contrary testimony from the interrogating officers (Claim 6(D)), and also by arguing that the jury should believe that testimony over Meister's because a criminal defendant has more incentive to lie than does law enforcement (Claim 6(C)). The prosecution then pounded the nail home by opining that Meister made up his testimony to appeal to Ofshe's theories. (Claim 6(E).) The prosecution undercut Meister's testimony on the pivotal issue of what happened during the unrecorded portion of the interrogation that resulted in the confession. However, had the improperly cumulative testimony on the subject from law enforcement been precluded, and their version of events reduced to a single telling as Meister's version was; and had the prosecutor's inappropriate comments about Meister's credibility been stricken, then there would have been more equilibrium between Meister and his interrogators about what happened when the recording equipment was off on August 29, 2002.

Furthermore, had Ofshe been allowed to apply his expertise to the facts, he would have walked the jury through Meister's interrogation based on the objective circumstances and admissions from the interrogators, and assisted the jury in identifying and understanding the nuanced techniques employed against Meister that have been scientifically determined to cause false confessions. (Claim 1.) This evidence would support a reasonable jury in finding the confession false. [Meister is cognizant of the fact that this Court has already determined Claim 1 is procedurally defaulted, and so will not factor into the prejudice analysis. Meister has, nonetheless, factored Claim 1 here in the interest of preserving the matter for appeal.]

Aside from the prosecution's case for motive or regarding the confession, the Prosecution's circumstantial evidence implicating Meister in the murder would have been far less persuasive had defense counsel presented alibi evidence proving the physical impossibility of Meister returning home, on foot, in the time frame argued by the prosecution, between the shooting and when Meister was seen at home and then at Papa John's. (Claim 4.) The jury reasonably could have discounted Meister as the culprit, and accepted the circumstantial evidence against the alternative perpetrator, who had motive, opportunity, met the physical description of the shooter, and admitted to the murder, showing peculiar knowledge of the crime. (Dkt. 1-1, Ex. D at 191-193.)

The cumulative impact of defense counsel's incompetence has, in view of the above, established prejudice for the purposes of Strickland. But for further evidence of counsel's unprofessional conduct, this Court can look to Claim Six(F). Although that error does not tie into the above narrative in any specific way, counsel's failure to oppose the prosecutor's inflammatory remark about the trial rights of the accused verses those of the victim is continuing proof of deficient performance. See Goodman v. Bertrand, 467 F.3d 1022, 1030 (7th Cir. 2006) (counsel's errors need not combine in one or another particular way to prejudice the defendant, but may, though harmless in isolation, nonetheless create a clear pattern of IAC).

The state cites Hill v. Davis, 781 Fed. Appx. 277 (5th Cir. 2019), and Gray v. Montgomery, 2018 WL 7889825 (C.D. Cal. 2018), in its argument that the doctrine of cumulative error is not "clearly established" with respect to claims of IAC. (Dkt. 28 at 50-51.) Hill, however, is out-of-Circuit, unplublished, and does not actually analyze the issue, but states, obtusely, that there is no Supreme Court precedent "affirmatively instructing lower

courts to calculate prejudice on a cumulative basis." 781 Fed. Appx. at 284. Gray observes the Circuit split on whether the doctrine applies in the IAC context, and holds the doctrine, as applies to IAC, is not established explicitly in Supreme Court cases. 2018 WL 7889825 at *30-31.

However, neither Hill nor Gray address that "the lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since 'a general standard' from this Court's cases can supply such law." Marshal v. Rodgers, 133 S.Ct. 1446, 1449 (2013) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Nor do those cases address why the cumulative error doctrine reasonably may not apply to claims of IAC. Any "fair minded disagreement" would start there. See Williams v. Taylor, 529 U.S. at 407 (application of Supreme Court law unreasonable if a court refuses to extend a principle to a context in which it should apply). Whether cumulating trial error or IAC error, the result is prejudice to the defendant's case. Whether the deprivation resulted from multiple trial errors or multiple errors by counsel is a distinction without meaning, and, thus, failure to apply the cumulative error doctrine to the context of IAC is unreasonable.

It appears that the state is attempting to muddy clear waters, because the Ninth Circuit, applying Supreme Court precedent, has explicitly stated that cumulative error may result from "the prejudice from both trial court errors and deficiencies of trial counsel." Alcala, 334 F.3d at 883 n.7 (citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992); see Dubria v. Smith, 197 F.3d 390, 399-403 (9th Cir. 1999) (combining trial error and error by trial counsel); see also Dkt. 28 at 51 (citing U.S. v. Tucker, 716 F.2d 576, 595 (9th Cir. 1983); Harris v, Wood, 64 F.3d 1432, 1438 (9th Cir. 1995). The law is clear that this Court may conduct de novo review under § 2254(d)(1)

"[b]ecause 'the [cumulative] impact of these errors is devastating to one's confidence in the reliability of the verdict,' [and] the district court [should hold] that the [Idaho Court of Appeals'] decision to the contrary was an unreasonable application of [Chambers v. Mississippi, 410 U.S. 284, . . . (1973); Krulewitch v. United States, 336 U.S. 74, . . . (1949), and Hawkins v. United States, 358 U.S. 74, . . . (1954)].'" Parle v. Runnels, 505 F.3d 922, 926 (9th Cir. 2007) (bracketed SCOTUS cases in original) (quoting Parle III, 505 F.Supp.2d at 1172).

And yet, irrespective of whether cumulative IAC error is clearly established for purpose of § 2254(d)(1), there remains three approaches for de novo review under the "unreasonable determination of facts" provision of § 2254(d)(2). First, the Idaho Court of Appeals held that cumulative error was not established because Meister failed to make even a single prima facie claim of IAC. (Dkt. 10 PT1, #9 at 40.) Meister has demonstrated the contrary herein, and this Court owes no deference to the state court's conclusion, because it was infected by substantive legal error that unreasonably found Meister had not satisfied Strickland for any of his IAC claims. Taylor, 366 F.3d at 1001. Second, the courts of Idaho denied Meister relief without providing him opportunity to substantiate his IAC claims by use of discovery or evidentiary hearing. (See Section VI(B); incorporated by reference.) And third, the Idaho courts' entire prejudice analysis is premised on the unreasonable factual finding that evidence of Meister's guilt is overwhelming. (See Section VI(A); Dkt. 19 at 10-17, 22-26; incorporated by reference.)

F.   Claim Eight

The summary dismissal of Claim Eight(A) was affirmed by the Idaho Court of Appeals on the basis of procedural default, specifically that Meister's allegation that his jury could overhear court proceedings while excused

from the courtroom (1) could have been raised on direct appeal but was not, and (2) there was insufficient evidence to support the allegation. (Dkt. 10 PT1, #9 at 39.) However, neither the state post-conviction court nor the appeals court addressed Meister's subclaim Eight(B) which alleged counsel were ineffective for failing to object to the extrinsic influences on the jury. (Id.) The Idaho courts do not mention the IAC claim of Eight(B): There is no discussion of whether counsel's actions were presumptively reasonable under the first prong of Strickland, and there is  no discussion of the alleged "structural error" as relates to the prejudice test of Strikland's second prong. In fact, the record indicates that the Idaho courts mistakenly overlooked subclaim Eight(B). Therefore, this Court may proceed to de novo review of Eight(B) because no AEDPA deference is due under § 2254(d)(1) to a state court dismissal made by mistake. See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002).

Nonetheless, Meister has demonstrated defense counsel's unprofessional conduct and resulting prejudice for the purposes of Strickland, and any conclusion otherwise necessarily is based on an unreasonable application of Supreme Court law. (§ 2254(d)(1).) The first prong of Strickland is satis-fied because the state, currently, or in any prior proceeding, has not argued (or pointed to evidence) against Meister's allegation that there can be no objectively reasonable purpose for defense counsel to permit this type of extrinsic influence on the jury. Nor is there an reasonable, or lawful, justification for counsel to acquiesce in the breakdown of the trial process. Second, the error is "structural" and resulted in a "fundamentally unfair trial" for the purposes of Strickland's prejudice requirement. [The state's assertion that Meister has never alleged prejudice under Strickland is not correct. See Dkt. 10 PT1, #15 at 51 n.9, 54; Dkt. 10 PT2, Vol 18 at 3756-

3768.]

An error is "structural" if it fundamentally undermines the reliability and fairness of the trial. Arizona v. Fulminate, 499 U.S. 279, 309-10 (1991). Broadly, there are three kinds of structual error, if (1) the right at issue protects some public interest, other than to protect the defendant from an erroneous conviction; (2) "the effects of the error are simply too hard to measure"; or (3) "the error always results in fundamental unfairness." Weaver v. Massachusetts, 137 S.Ct. 1899, 1908 (2017). "These categories are not rigid. In a particular case, more than one of these rationales may be part of the explanation for why an error is deemed to be structural." Id. at 1908 (citation omitted). When a structural error is alleged via a claim of IAC, as is the circumstance here, the petitioner has the option of demonstrating Strickland prejudice in the usual way that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" or by showing "that attorney errors rendered the trial fundamentally unfair." Weaver, at 1911 (suggesting but declining to specifically hold fundamentally unfair trial sufficient prejudice for Strickland). A showing of "fundamentally unfair trial" is a lesser burden than "a probability of a different outcome at trial." Id.

At no point has the state contested that a structural error is created when a jury can overhear extrinsic evidence and argument while excused from the court proceedings. There really is no other reasonable way to define the errors than as "structural. Such flaw, if true, undermines the purpose of , say, the function of proffer or the discretion of the court to exclude or otherwise qualify evidence. In this case, "the effects of the error are simply too hard to measure." Weaver ai 1908. Additionally, the error is

structural because an insufficiently sound-insulated jury room affects the fundamental right to an impartial jury for    every criminal defendant tried in that courtroom. Irvin v. Dowd, 366 U.S. 717, 722 (1961) (right to impartial jury); Remmer v. U.S., 347 U.S. 227, 229 (1954) (unauthorized communication, contact, or tampering with jury is presumptively prejudicial).

Rather, the state argues that the Idaho Court of Appeals properly affirmed the dismissal, on the basis that Meister failed to supply material evidence that the jury room was not insulated from sound generated in the courtroom. (Dkt. 28 at 55.) The state also argues the allegation that jurors could overhear court proceedings, and that the judge and other court officers were complicit, "strains credulity" on its face. (Dkt. 28 at 55-56.)

As to the credulity of the allegation, this Court should note that Meister hired a forensic expert to independently determine whether and to what degree proceedings in Courtroom Three could be perceived within its jury room. (Dkt. 1-1 at 60-61.) The state district judges denied the expert access to the courtroom and jury room to perform an investigation. However, this Court should accept the state's invitation to test the "credulity" of the allegation, and order authorization for discovery and an evidentiary hearing on the matter. (See Meister's Motion for Rule 6 Discovery; Evidentiary Hearing; and Appointment of Counsel.)

This Court may conduct de novo review under § 2254(d)(2) because the state post-conviction court dismissed the claim based on its unreasonable determination of the facts. Here is the entire fact analysis.:

> The allegation is bare and conclusory and unsupported by admissible evidence. The Court notes the Petitioner submitted an affidavit of a witness who stated she heard a recording the jury played in the jury room while the jury was deliberating the Petitioner's first trial in this matter. The Petitioner failed to submit any evidence in relation to the most recent trial.

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 58

(Dkt. 10 PT2, Vol. 21 at 14.) The post-conviction record clearly contradicts the court's finding:

Meister provided his own testimony regarding personal experiences of overhearing courtroom proceedings while enclosed in the juryroom at both the 2011 and 2003 proceedings. (Dkt. 10 PT2, Vol 18 at 4005-06.) The state court completely overlooked this unchallenge and admissible evidence. Lynn Aldridge also provided testimony that in 2003 she was in the spectators' area of the courtroom and could clearly overhear an audio recording being played by Meisetr's jury while enclosed in the jury room for deliberations. (Dkt. 10 PT2, Vol. 17 at 3602-04.) The evidence from Meister and Aldridge is relevant under IRE 402 to the question of (1) whether or not the jury room was sufficiently soundproofed and (2) whether defense counsel knew of and were ineffective for failing to rectify the problem. Meister's and Aldridge's testimonies were to matters within their "personal knowledge," and so were admissible under IRE 602. The fact that Meister's cannot point to specific dates and times, and to which proceedings he overheard while in the jury room, is immaterial to the question of the jury room's sound-proofing. The fact that any proceeding, let alone the numerous proceedings Meister overheard (Dkt. 1-1 at 59), can be overheard from within the jury room is prima facie evidence that all proceedings can be overheard.

The court's finding that Aldridge's testimony was irrelevant because it pertained to the 2003 trial and not the trial in 2011 is irrational. Meister's 2011 trial took place in Courtroom Three of the Latah County Court-house, the same place of his 2003 trial.    . There is no reason to believe the acoustic juxtaposition of Courtroom Three and its jury room was any differ. in 2011 than it was in 2003. There is no evidence suggesting the jury room was soundproofed by 2011; in fact, the state has never offered

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 59

any evidence to challenge Meis ter's allegation that court proceedings can be overheard from the jury room. (Dkt. 10 PT2, Vol. 18 at 3549, 3577-78.)

Meister also pointed to evidence in the record that suggested the state district court, the prosecutor, and defense counsel were all aware of the jury's ability to overhear from the jury room: Deputy Prosecutor Michelle Evans expressed in open court during the 2011 trial that she feared the excused jury could overhear a defense audio exhibit being played on proffer. Evans asked that the sound volume be lowered. (Tr. 2341: 20 – 2342: 5.) The transcript reflecting this event was in record at state post-conviction, and is otherwise admissible under IRE 902 and 903. The post-conviction court ignored this evidence.

At the very least Meisetr's evidence is prima facie proof that the jury could perceive extrinsic evidence and argument throughout the entirety of the 2011 trial. None of Meister's evidence was contradicted by evidence offered by the state, nor is Meister's evidence incredible on its face or refuted by the record, and so the court should have authorized further discovery investigation into the matter and also held an evidentiary hearing. See Martinez v. State 126 Idaho 813, 816-17 (Ct. App. 1995). The court's failure to allow Meister to develop the factual bases of his claim further than the prima facie stage rendered its subsequent factual determination and summary dismissal "unreasonable." Nunes v. Mueller, 706 F.3d 1045, 1054 (9th Cir. 2003); Hurles, 706 F.3d at 1038-40. (Again, this Court is reminded that the state district judges personally interfered with Meister's attempt to empirically test the soundproofing of the jury room. (Dkt. 1-1 at 59).)

Whether evaluating prejudice under the traditional Strickland threshold of "a reasonable probability of a different trial outcome" or under the easier alternative showing that the errors "rendered the trial fundamentally

unfair," this Court should grant relief. In the first instance, the record reflects several matters that were highly prejudicial to the defense that were mistakenly understood to have been excluded from the jury. (Dkt. 10 PT2, Vol. 19 at 4007-08.) For example, the jury overheard that Detective Westbrook requested Meister take a polygraph but Meister refused. (Tr. 2112-13.) The jury did not hear the mitigating fact that Meister did eventually agree to take a polygraph. In another example, Jesse Linderman was called to the stand merely to assert his right to remain silent and be excused as a witness. (Tr. 2108-11.) See e.g. U.S. v. Rivas-Macias, 537 F.3d 1271, 1275 (10th Cir. 2008) (subjective tendency for jury to infer guilt from witness' invocation of right to silence is prejudicial).

In the second instance, should the evidence satisfy this Court as to the occurrence of a structural error, then it follows that defense counsel's failure to register an objection to the jury listening in on extrinsic matters, for the entire trial, resulted in the trial being "fundamentally unfair," because the mechanism by which evidence is evaluated for admissibility was essentially absent for Meister's trial. Had counsel objected, some measure, such as the use of a whitenoise maker, could have assured the jury considered only evidence properly before it.

## VII.   CONCLUSION

For the foregoing reasons, this Court may conduct de novo review of each of Meisetr's remaining claims, grant the Writ, and grant relief, vacating Meister's criminal convictions for Conspiracy and for Murder.

DATED this  25  day of  August    2020.

PETITIONER'S REPLY TO RESPONDENT'S ANSWER AND BRIEF - 61

CERTIFICATE OF SERVICE

I hereby certify that on the below date I submitted the original fore-going document to the ISCI Resource Center Paralegal for copying and mailing to the Clerk of Court for ECF filing and service on opposing counsel. I have not mailed a copy of the document to opposing counsel, because the ISCI Resouce Center Paralegal, Alan Stewart, would not make a copy for that purpose.

DATED this _25_ day of _August_ 2020.

_____

David Meister

**ATTACHMENT   A**

_____

Latah County Case CR 2002-01534; Motion In Limine Regarding
Prosecution Closing Argument (dated November 21, 2011).

CASE NO. *CR02-1534*

2011 NOV 21  AM 8:42

CLERK OF DISTRICT COURT
LATAH COUNTY

BY _____ DEPUTY

THOMAS W. WHITNEY
WHITNEY & WHITNEY, LLP
Attorneys at Law
604 S. Washington, Suite 1
P.O. Box 8417
Moscow, Idaho 83843
Tele: 208.882.6872
Fax: 208.441.9575
E-mail: tww@whitneyllp.com
Idaho State Bar No. 5664

SCOTT CHAPMAN
CHAPMAN LAW OFFICES, PLLC
1106 Idaho St.
P.O. Box 446
Lewiston, Idaho 83501
Tele: 208.743.1234
Fax: 208.743.1266
Idaho State Bar No. 3467

Attorneys for Defendant

IN THE DISTRICT COURT OF THE SECOND JUDICIAL DISTRICT OF THE

STATE OF IDAHO, IN AND FOR THE COUNTY OF LATAH

| STATE OF IDAHO, | Case No. CR 2002-01534 |
|---|---|
| Plaintiff, | MOTION IN LIMINE REGARDING PROSECUTION CLOSING ARGUMENT |
| v. | |
| DAVID J. MEISTER, | |
| Defendant. | |

COMES NOW Defendant David J. Meister and moves the Court as follows *in limine*

regarding the State's oral closing argument to the jury in this matter.

1872

1. **The State should be precluded from arguing that the credibility of Brian Keim or David Meister is affected by their attendance of religious classes regarding Odinism.** While in prison Mr. Keim and Mr. Meister attended classes regarding the Odinism religion.  Mr. Keim described the classes as follows at Page 8 of the certified transcript of his trial testimony before the jury:

```
 9    Q.  When you say you attended religious classes,
10    what -- can you explain what that was?
11    A.  Well, while I was in prison, I, like, started
12    studying about, like, the history of my ancestors and
13    stuff like that.  And one of their religions that they
14    believed was called Ositrue or Odinism, okay.  They call
```

He further described the classes at Page 10 of the certified transcript of his trial testimony before the jury:

```
 3    Q.  This -- you called it Odinism?
 4    A.  Yes.
 5    Q.  Just generally, what is that?
 6    A.  It's -- it's the -- it's the pre-Christian
 7    religion of the Northern European people.  During the
 8    Viking times, they believed in this.  They believed
 9    there was a Thor and an Odin and like a whole bunch of
10    gods and stuff like that, you know.
```

Mr. Meister attended the classes also and, according to Mr. Keim, could have been a "helper" in classes.  Mr. Keim described Mr. Meister's involvement in the classes as follows at Page 26 of the certified transcript of his trial testimony:

WHITNEY, MOSCOW & WHITNEY, IDAHO, L.L.P.

8      Q.   And explain, sir, the hierarchy in Odinism.

9      A.   They have a priest they call a gothi.  And beyond

10   that, it's just volunteers that do, like, organizing and

11   studies and stuff like that.  So...  I'm not sure if you

12   call that a hierarchy, because there was only one leader

13   of the thing, and it was the priest, the gothi.

14     Q.   Okay.  And Mr. Meister was a helper.  He was --

15   he helped lead those classes, didn't he?

16     A.   He could have been.  I think I remember him,

17   like, aiding in it, but I can't remember specifically

18   when he did it, though.  So...

Rule 609 of the Idaho Rules of Evidence states the following: "Evidence of the

beliefs or opinions of a witness on matters of religion is not admissible for the

purpose of showing that by reason of their nature the credibility of the witness is

impaired or enhanced."  Thus, the State should be precluded from stating or

implying in its closing argument that the credibility of either Mr. Meister or Mr.

Keim is affected by their attendance of religious classes regarding Odinism.

2.  **The State should be precluded from arguing that Mr. Keim testified in support**

**of Mr. Meister due to what the State termed the "Odinistic brotherhood."**

Counsel for the prosecution questioned Mr. Keim pointedly before the jury

regarding what plaintiff's counsel termed the "Odinistic brotherhood."  *See* Keim

transcript at p. 26, L. 3 to p. 27, L. 7.  On re-direct examination Mr. Keim stated

bluntly that he was not testifying in support of Mr. Meister out of loyalty rooted in

shared religion.  *Id.* at p. 35, LL 7-23.  The repugnance of this sort of argument is

1   readily apparent if a different religious denomination is substituted for the word

2   "Odinism" in an otherwise verbatim repetition of one of the State's questions (*see* p.

3   27, L. 4-6). One example would be, "And so, as a brother in *Judaism*, you and Mr.

4   Meister, you have loyalty to Mr. Meister; isn't that true?" Another example: "And

5   so, as a brother in *Islam*, you and Mr. Meister, you have loyalty to Mr. Meister; isn't

6   that true?" Numerous equally offensive questions could be constructed, and the

7   State's apparent argument in pursuing this line of questioning is that it is permissible

8   because the religion of Odinsim is not a mainstream religion on modern America.

9   Argument of this type falls outside I.R.E. 609 and undercuts the freedom of religion

10  guaranteed by the First Amendment to the United States Constitution and Article I,

11  Section 4 of the Idaho Constitution. This case should be decided on the facts, not

12  on whether or not Mr. Meister and Mr. Keim both attended classes in a religion

13  which happens to be in the minority. *See generally United States ex rel. Haynes v.*

14  *McKendrick,* 481 F.2d 152 (2d Cir. 1973).

15  3.  **The State should be precluded from including the words "sin" and**

16  **"repentance" in its closing argument in any form, and the State should be**

17  **precluded from implying that the religious notions of "sin" and "repentance"**

18  **have any bearing on the outcome of this proceedings whatsoever.** The State

19  questioned Mr. Keim repeatedly before the jury regarding the religious terms "sin"

20  and "repentance." The following exchange appears on pages 27 and 28 of the Keim

21  transcript:

WHITNEY & WHITNEY, LLP
MOSCOW, IDAHO

```
19    Q.  And isn't it true that the Odinistic belief is
20    that sin is denied and contrition is denounced; that
21    Odinists see repentance as a mark of weakness?
22    A.  I don't know about that.  I don't remember that,
23    but I haven't really -- I've kind of drifted away from
24    it a little bit over the years.  So... But I mean, the
25    typical idea of, like, sin and stuff like that is --


1     that's generally a Christian belief or Muslim or Jewish,
2     you know.
3         It's -- and Odinism is a pagan religion, so their
4     idea of sin has to do with violating the Nine Noble
5     Virtues, which are what I told you earlier.  So...
```

The State pursued this same line of inquiry again later in Mr. Keim's testimony.

```
15    Q.  But, of course, Odinism doesn't see repentance
16    -- or sees repentance as a mark of weakness?
17    A.  Well, that's -- I don't know about that.
```

"Sin" and "repentance" are religious concepts, not legal concepts.  Appeals to religious prejudice are improper for the reasons set forth above.  Moreover, although this point should be irrelevant, Mr. Keim never confirmed the prosecutor's suspicions regarding Odinism, other than to differentiate Odinism from Christianity, Judaism, and Islam.

4. **The prosecution should be precluded from displaying firearms cartridges to the jury other than those which are in evidence.**  During the questioning of one or more witnesses the prosecution held up and displayed from counsel table one or

more firearms cartridges which were never marked as exhibits and never offered into evidence. The cartridge or cartridges may have been represented to be .308 rifle cartridges. It is unknown what type of cartridge was displayed or who manufactured the cartridge. There is no legal basis to introduce new items of evidence to the jury during closing argument, and the prosecution should be barred from displaying to the jury as evidence in the case any object not actually tested in the trial process and introduced into evidence.

DATED this 18th day of November 2011.

WHITNEY & WHITNEY, LLP

By: Thomas W. Whitney
Attorney for Defendant

### CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of November 2011 a true and correct copy of the foregoing document was served on the following by the method indicated.

| Mr. William W. Thompson, Jr. | [ ] U.S. Mail, first class |
| Latah County Prosecuting Attorney | [ ] Hand delivery |
| Latah County Courthouse | [ ] Facsimile |
| P.O. Box 8068 | [x] Email: mevans@latah.id.us |
| Moscow, ID  83843 | |

| Hon. Carl B. Kerrick | [ ] U.S. Mail, first class |
| District Judge | [ ] Hand delivery |
| Nez Perce County Courthouse | [ ] Facsimile |
| P.O. Box 896 | [x] Email: |
| Lewiston, ID  83501 | tdammon@co.nezperce.id.us |

Thomas W. Whitney

1877