UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID JOSEPH MEISTER,<br><br>Petitioner,<br><br>v.<br><br>TYRELL DAVIS,[1]<br><br>Respondent. | Case No. 1:19-cv-00173-DKG<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is a Petition for Writ of Habeas Corpus, filed by Idaho prisoner David Joseph Meister, challenging Meister's Latah County convictions (after a second trial) of conspiring and murdering Tonya Hart. *See* Dkt. 1. The prosecution's theory of the case was that Tonya's boyfriend—Jesse "Shorty" Linderman—hired Meister to kill Tonya.

United States Magistrate Judge Candy W. Dale previously dismissed Claims 1, 2, part of 7, and 8(a) as procedurally defaulted without legal excuse. *See* Dkt. 24. This case was later reassigned to the undersigned judge. The remaining claims in the Petition are now fully briefed and ripe for adjudication on the merits.

---

[1] Respondent Tyrell Davis is substituted for his predecessor, Al Ramirez, as warden of the facility in which Meister is confined. *See* Rule 2(a) of the Rules Governing § 2254 Cases ("Habeas Rules"); Fed. R. Civ. P. 25(d).

The Court takes judicial notice of the records from Meister's state court proceedings. *See* Dkt. 17, 27; Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006).

All parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. *See* Dkt. 7. Having carefully reviewed the record in this matter, including the state court record, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d).

For the reasons explained below, the Court will enter the following Order denying habeas corpus relief.

## BACKGROUND

Absent clear and convincing evidence to the contrary, *see* 28 U.S.C. § 2254(e)(1), the following facts of Meister's case, as described by the Idaho Court of Appeals and the Idaho Supreme Court, are presumed correct:

> On December 11, 2001, Tonya Hart was shot twice in her home in Moscow, Idaho, which she shared with her boyfriend Jesse Linderman. The shooter approached the front entrance of Tonya's trailer and then proceeded to the back entrance [as evidenced by footprints in the snow]. When Tonya opened the back entrance of the trailer she was shot twice, once in the chest and once in the face. The shooter then retreated behind the trailer, running through a snow covered field and eventually exiting the field on a nearby road. A neighbor heard the gun shots and went to Tonya and Jesse's trailer. He then called 911 and proceeded unsuccessfully with resuscitation efforts. Tonya was pronounced dead at the scene.

*State v. Meister*, 220 P.3d 1055, 1057 (Idaho 2009) (footnote omitted) (direct appeal after first trial). Tonya's autopsy later revealed that the murder weapon was a nine-millimeter handgun. *State's Lodging B-4* at 2 (Idaho Ct. App. 2007), *rev'd on other grounds by Meister*, 220 P.3d 1055.

The footprints of the person whom police believed was the murderer eventually led to a road. Near that road, police found a briefcase in the snow. The briefcase contained marijuana residue and, it was later determined, had been stolen from Meister's roommate, Jeremy White, shortly before the murder. *Id.*

An individual named Lane Thomas had stolen White's marijuana. Thomas initially admitted to police that he had stolen the briefcase—and thrown it out of his car after retrieving the marijuana—while he was "driving near the scene of the crime at approximately *the same time the murder took place.*" *Id.* (emphasis added). Thomas later testified that he stole the briefcase of marijuana from Jeremy White on the day *before* the murder, not the day *of* the murder. *State's Lodging C-15* at 1489, 1494–95; *C-18* at 3481–86.

Early in the investigation, the police considered Thomas "to be a primary suspect" in the murder. *State's Lodging B-4* at 2. Later, however, a man named Michael Garrison informed the police that, in the week before the murder, he had sold a nine-millimeter High Point handgun, as well as a box of ammunition, to David Meister. *Id.* Police then shifted their attention to Meister.

Meister was first interviewed by police in April 2002. The second interview, which eventually resulted in a confession, took place on August 29, 2002. "Although the

[August 29] interview took over four hours, Meister was given several breaks to walk outside and smoke." *Id.*

Meister admitted to police that he killed Tonya "as part of a murder-for-hire conspiracy" with Jesse Linderman, Tonya's boyfriend:

> In his confession, Meister explained that Linderman offered him $1000 to kill Hart and had given Meister $500 in advance. Meister further explained that, after some period of time, Linderman promised to give him a $100 bonus if he killed Hart before Christmas. Meister admitted to going to Hart's home, attempting to open the front door, and when he could not, circling around to the back door, which he knocked on. Meister described shooting Hart with the handgun, twice, when she opened the back door. After the shooting, Meister stated that he fled over the hill near Hart's home and then to his home. Meister also described how he disposed of the weapon and some of his clothes as he returned to his home that night.

*Id.*

Meister was charged with first-degree murder and conspiracy. *Meister*, 220 P.3d at 1057. Linderman also was initially charged with conspiracy to murder Tonya, but that case "was later dismissed because the only evidence tying Linderman to the crime was Meister's confession." *Id.*

The trial court denied Meister's motions to suppress his confession, concluding that the confession was voluntary. The trial court also denied Meister's motion to admit evidence of an alternate perpetrator—Lane Thomas, the man who had stolen the briefcase found near the road along the killer's flight path. *Id.* at 3. Consequently, the defense at the first trial focused on the theme that Meister's confession was false and coerced.

The jury found Meister guilty. On appeal, the Idaho Supreme Court held that the trial court applied the wrong standard when it denied Meister's motion to admit evidence of an alternate perpetrator. The appellate court vacated the convictions and ordered a new trial. *State's Lodging B-8.*

Defense counsel took advantage of the decision in that first appeal and, at the second trial, presented an alternate-perpetrator defense. The primary defense theory was that it was Lane Thomas, not Meister, who killed Tonya. Thomas's alleged motive was connected to the theft of the briefcase—the argument went that Thomas not only stole the briefcase of drugs from Jeremy White on the night of Tonya's murder, but also attempted to steal drugs from Jesse Linderman that same night. The defense alleged that Thomas unexpectedly found Tonya at her and Linderman's home when he went to steal the drugs, and Thomas killed her when she recognized him.

The alternate-perpetrator defense relied on the testimony of two witnesses who had been incarcerated with Thomas. These witnesses testified that Thomas confessed to killing Tonya. *State's Lodging C-18* at 3590–3603, 3619–22, 3625–30, 3633–37. The defense also relied on Thomas's initial statement to police that, *on the night of* Tonya's murder, not the night before the murder, Thomas stole White's briefcase of marijuana and left it on the road—the same road where the killer's footprints led. *Id.* at 3496–3565.

In addition to presenting an alternate-perpetrator defense, Meister again took the position that his confession was false and coerced. Meister and the interviewing officers

testified as to what happened in the August 2002 interview.[2] Meister voluntarily went to the station and spoke with police; he was informed that he did not have to answer questions and was free to leave. Meister also left the interview room several times for breaks and then voluntarily returned to continue the interview. *State's Lodging C-16* at 2025–2026, 2046, 2058–2061.

Meister testified that he falsely confessed to police because he believed his situation was hopeless and that he had to confess, or he would receive the death penalty. Meister stated he obtained certain details regarding the murder from police and made up other details while he was confessing. *State's Lodging C-17* at 3061 to *C-18* at 3254. The defense also called an expert, Dr. Offshe, to testify about coercive police tactics that can result in a false (or true) confession. *Id.* at 2934–3004. Defense counsel also emphasized that some of the things Meister said in his confession did not match the facts of the case.

But Meister's confession was not the only evidence against him. Two witnesses testified seeing a man walking along Highway 95 the night of the murder, "wearing a plaid flannel shirt, dark baggy pants, and possibly a scarf and that he walked with an unusual gait." *State's Lodging F-4* at 4; *see also State's Lodging C-15* at 1158–84, 1231–39. This was consistent with Meister's statement in his confession that "prior to going to the victim's home, he drank a couple of beers, put on dark corduroy pants, a red flannel shirt, black scarf, and black beanie." *State's Lodging F-4* at 4.

---

[2] Only Meister's "final repetition of his confession" was recorded. *State's Lodging B-4* at 2. Therefore, to determine what happened in the interview before the recording began, the jury had to rely on the participants' testimony.

The shoeprints in the snow leading away from the murder scene were determined to have been left by Osiris ODS shoes, likely sized 8.5 to 9.5. Witnesses testified that Meister owned Osiris ODS shoes, and a shoe salesperson measured Meister's feet at size 8.5 to 9. *State's Lodging F-4*.

Firearms experts testified that the bullets that killed Tonya were Ultramax-brand remanufactured ammunition and were fired from a High Point 9mm semiautomatic handgun. Michael Garrison had sold the same type of ammunition and the same type of gun to Meister in the week before the murder. *Id.* at 3–4. Garrison also testified that when he asked Meister what he was going to do with the gun, Meister responded that he was "going to shoot somebody in the face." *Id.* at 4. After the murder, Meister offered two different people a box of 9mm ammunition, one of whom said that Meister told him he was afraid the bullets were used in a crime and ultimately threw the ammunition away. *State's Lodging C-17* at 2886–89.

Duane Scott—who lived in the same house as Meister—testified that after Tonya's murder was reported, he was talking with Meister about whether the murder might be connected to the theft of White's briefcase of marijuana. Meister asked, "What would you say if I told you I did it?" *State's Lodging C-16* at 1757. After Scott responded, "I don't know," Meister stated, "Well, I did it." But then Meister told Scott that he was just kidding. *Id*.

James Collyer, the father of one of Meister's friends, testified that, at one point when Meister was visiting, they were watching a detective show. Collyer mentioned to Meister that the perpetrators of the crime featured on the show must not be very bright

"because that's not how you would do it." *State's Lodging C-17* at 2912. In response, Meister told Collyer that Meister had killed the girlfriend of a co-worker for money. Meister said he had gone to the woman's trailer house, knocked, and then shot her. *Id.* at 2912–13. Meister then told Collyer that he left the trailer, that there was snow on the ground, that he changed clothes, and that he dumped the gun and shoes in a garbage can. *Id.* at 2914. These facts were consistent with those that Meister recounted in his confession.

The jury again found Meister guilty of first-degree murder and conspiracy to commit first-degree murder. The Idaho Court of Appeals affirmed, and the Idaho Supreme Court denied review. *State's Lodging D-5*; *D-8.*

In state post-conviction proceedings, Meister asserted, among other things, that his trial counsel was ineffective in numerous ways. The Idaho Court of Appeals rejected Meister's claims, and the Idaho Supreme Court denied review. *State's Lodging F-4*; *F-11.*

The following claims in the instant Petition, all of which assert ineffective assistance of trial counsel, remain for adjudication on the merits:

- Claim 3 asserts that trial counsel should have presented more evidence that certain details in Meister's confession did not match the facts of the case and that, therefore, the confession could not be true.

- Claim 4 asserts that counsel failed to present more evidence of Meister's alibi.

- Claim 5 alleges that defense counsel introduced prejudicial evidence on two occasions.

- Claim 6 asserts that defense counsel should have made various objections to certain evidence and during the prosecution's closing argument.

- Claim 8(b) alleges that trial counsel should have objected that the jury room was not insulated from sound.

- Finally, the remaining portion of Claim 7 asserts cumulative error arising from defense counsel's alleged errors.

For the reasons that follow, the Court concludes that Meister is not entitled to habeas relief.

## HABEAS CORPUS STANDARD OF LAW

A federal court may grant habeas corpus relief when it determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). If the state court has adjudicated a claim on the merits, habeas relief is further limited by § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal habeas relief must be denied unless the state court's adjudication of the petitioner's claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

MEMORANDUM DECISION AND ORDER - 9

28 U.S.C. § 2254(d).

The term "unreasonable" in § 2254(d) is reserved for "extreme malfunctions in the state criminal justice system," not for "ordinary error" or even for cases "where the petitioner offers a strong case for relief." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per curiam) (internal quotation marks omitted). Accordingly, a federal court reviewing a state court's adjudication of a claim on the merits "must carefully consider all the reasons and evidence supporting the state court's decision." *Id*. Courts are not permitted "to essentially evaluate the merits *de novo* by omitting inconvenient details from its analysis." *Id*. (internal quotation marks and alteration omitted). Instead, "[d]eciding whether a state court's decision involved an unreasonable application of federal law or was based on an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims and to give appropriate deference to that decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) (internal quotation marks and citations omitted).

When a petitioner contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694

(2002). Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court—although identifying "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014) (emphasis omitted).

The AEDPA standard is extraordinarily high, and a federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong. Rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Williams*, 529 U.S. at 411. If there is *any* possibility that fair-minded jurists could disagree on the correctness of the state court's decision, § 2254(d)(1) precludes relief. *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013); *Harrington v. Richter*, 562 U.S. 86, 101–02 (2011).

"Clearly established federal law" means the governing legal principles set forth in the holdings—not the dicta—of the United States Supreme Court, as of the time the state court rendered its decision. *Williams*, 529 U.S. at 412. The habeas statute does not require an *identical* factual pattern before a legal rule must be applied. To the contrary, state courts must reasonably apply the rules squarely established by the Supreme Court's holdings to the facts of each case. *See White*, 572 U.S. at 427.

On the other hand, if a court must *extend* a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state court's decision. *Id.* at 407. A federal habeas court "may not overrule a state court for … holding a view different from its own" when the precedent from the Supreme Court "is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003). Although circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent, *Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir. 2000), a federal court may not refine or sharpen a general principle of Supreme Court habeas corpus jurisprudence into a specific legal rule that the Supreme Court itself has not announced, *Lopez v. Smith*, 574 U.S. 1, 7 (2014).

If no Supreme Court decision has confronted the specific question presented by a state prisoner's federal habeas petition—that is, if the circumstances of a petitioner's case are only similar to the Supreme Court's precedents—then the state court's decision cannot be "contrary to" any holding from the Supreme Court. *Woods v. Donald*, 575 U.S. 312, 317 (2015) (per curiam). By the same token, a state court cannot unreasonably apply established federal law that does not exist. *See, e.g., Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). Therefore, evidence that was not presented to the state court cannot be introduced on federal habeas review if (1) a claim was adjudicated on the merits in state court and (2) the underlying factual determinations of the state court were reasonable. *See Murray*

*v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014) ("After *Pinholster*, a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2).").

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable ... in light of the evidence presented in the State court proceeding." A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). Instead, state court factual findings are presumed to be correct and are binding on the federal habeas court unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 (9th Cir. 2019) (holding that § 2254(e)(1) "appears to apply to all factual determinations made by state courts"). "If reasonable minds reviewing the record might disagree about the finding in question," the finding is not unreasonable under § 2254(d)(2). *Pizzuto v. Yordy*, 947 F.3d 510, 530 (9th Cir. 2019) (internal quotation marks and alterations omitted).

If a petitioner satisfies § 2254(d)—either by showing that the state court's adjudication of the claim was contrary to or an unreasonable application of Supreme Court precedent under subsection (d)(1), or by establishing that the state court's factual

findings were unreasonable under subsection (d)(2)—then the federal habeas court must review the petitioner's claim de novo, meaning without deference to the state court's decision. *Hurles*, 752 F.3d at 778. When considering a habeas claim de novo, a district court may, as in the pre-AEDPA era, draw from both United States Supreme Court and circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).[3]

Even under de novo review, however, if the factual findings of the state court are not unreasonable under § 2254(d)(2), the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle v. Morgan*, 313 F.3d 1160, 1167–68 (9th Cir. 2002); *Kirkpatrick*, 926 F.3d at 1170 ("Unlike § 2254(d), § 2254(e)(1)'s application is not limited to claims adjudicated on the merits [by a state court]."). Conversely, if a state court factual determination is unreasonable, the federal court is not limited by § 2254(e)(1) and may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *See Murray*, 745 F.3d at 1000.

## DISCUSSION

All of Meister's remaining claims assert ineffective assistance of trial counsel on various grounds.

---

[3] *Teague* was recently modified by *Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021), in which the Supreme Court held that *Teague*'s exception to non-retroactivity for watershed rules of criminal procedure is no longer good law.

1.      **Clearly Established Law Governing Ineffective Assistance Claims**

The Sixth Amendment to the United States Constitution provides that a criminal

defendant has a right to the effective assistance of counsel in his defense. The Supreme

Court explained the standard for ineffective assistance claims in *Strickland v.*

*Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel

("IAC") must show that (1) "counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and

(2) those errors prejudiced the defendant by "depriv[ing] the defendant of a fair trial, a

trial whose result is reliable." *Id*. at 687. A petitioner must establish both deficient

performance and prejudice to prove an IAC claim. *Id.* at 697. On habeas review, a court

may consider either prong of the *Strickland* test first, or it may address both prongs, even

if one prong is not satisfied and would compel denial of the IAC claim. *Id.*

Whether an attorney's performance was deficient is judged against an objective

standard of reasonableness. *Id.* at 687–88. A reviewing court's inquiry into the

reasonableness of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly
> deferential. It is all too tempting for a defendant to second-
> guess counsel's assistance after conviction or adverse
> sentence, and it is all too easy for a court, examining
> counsel's defense after it has proved unsuccessful, to
> conclude that a particular act or omission of counsel was
> unreasonable. A fair assessment of attorney performance
> requires that every effort be made to eliminate the distorting
> effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct
> from counsel's perspective at the time. Because of the
> difficulties inherent in making the evaluation, a court must
> indulge a strong presumption that counsel's conduct falls

> within the wide range of reasonable professional assistance;
> that is, *the defendant must overcome the presumption that,
> under the circumstances, the challenged action might be
> considered sound trial strategy*. There are countless ways to
> provide effective assistance in any given case. Even the best
> criminal defense attorneys would not defend a particular
> client in the same way.

*Id.* at 689 (emphasis added) (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense or what evidence to present, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

> [S]trategic choices made after less than complete
> investigation are reasonable precisely to the extent that
> reasonable professional judgments support the limitations on
> investigation. In other words, counsel has a duty to make
> reasonable investigations or to make a reasonable decision
> that makes particular investigations unnecessary. In any
> ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the
> circumstances, applying a heavy measure of deference to
> counsel's judgments.

*Id.* at 690-91. That is, "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

The Ninth Circuit has provided some insight into the *Strickland* standard when evaluating an attorney's "strategy calls." These cases are instructive in the Court's

assessment of whether the state court reasonably applied *Strickland*. *See Duhaime*, 200 F.3d at 600.

A mere difference of opinion as to strategy does not render counsel's assistance ineffective. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981). Additionally, *Strickland* allows counsel wide discretion with respect to choosing a defense. *See Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998) (holding that counsel's failure to develop a mens rea defense was reasonable because such a defense "would have conflicted with the primary defense theory of misidentification"); *Turk v. White*, 116 F.3d, 1264, 1267 (9th Cir. 1997) (counsel's selection of self-defense theory was reasonable and obviated his need to investigate defendant's claim of incompetency). Of course, "counsel's investigation must determine trial strategy, not the other way around." *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017). However, if defense counsel chooses a defense after an adequate investigation, that choice does not constitute deficient performance simply because, in retrospect, it appears that a better strategy was available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).

Even if a petitioner shows that counsel's performance was deficient, the petitioner then must also show that the deficient performance caused prejudice. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. As the *Strickland* Court instructed:

> In making this determination, a court hearing an
> ineffectiveness claim must consider the totality of the
> evidence before the judge or jury. Some of the factual
> findings will have been unaffected by the errors, and factual
> findings that were affected will have been affected in
> different ways. Some errors will have had a pervasive effect
> on the inferences to be drawn from the evidence, altering the
> entire evidentiary picture, and some will have had an isolated,
> trivial effect. Moreover, a verdict or conclusion only weakly
> supported by the record is more likely to have been affected
> by errors than one with overwhelming record support. Taking
> the unaffected findings as a given, and taking due account of
> the effect of the errors on the remaining findings, a court
> making the prejudice inquiry must ask if the defendant has
> met the burden of showing that the decision reached would
> reasonably likely have been different absent the errors.

*Id.* at 695-96. To constitute *Strickland* prejudice, "[t]he likelihood of a different result

must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

The foregoing standard, giving deference to counsel's decision-making, is the de

novo standard of review. Another layer of deference—to the state court decision—is

afforded under AEDPA. In giving guidance to federal courts reviewing *Strickland* claims

on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application
> of the *Strickland* standard was unreasonable. This is different
> from asking whether defense counsel's performance fell
> below *Strickland*'s standard. Were that the inquiry, the
> analysis would be no different than if, for example, this Court
> were adjudicating a *Strickland* claim on direct review of a
> criminal conviction in a United States district court. Under
> AEDPA, though, it is a necessary premise that the two
> questions are different. For purposes of § 2254(d)(1), "an
> unreasonable application of federal law is different from an
> incorrect application of federal law." *Williams*, *supra*, at 410,
> 120 S. Ct. 1495. A state court must be granted a deference
> and latitude that are not in operation when the case involves
> review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101.

That is, when evaluating an IAC claim under § 2254(d), this Court's review of that claim must be "doubly deferential." *Pinholster*, 563 U.S. at 190 (internal quotation marks omitted). Because *Strickland* "is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Indeed, "the more general the rule, the more leeway state courts have" in deciding constitutional claims. *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (per curiam) (internal quotation marks omitted).

For the reasons explained below, the Court will deny Meister's remaining IAC claims and dismiss the petition.

## 2.      Meister Is Not Entitled to Habeas Relief on Claim 3

In Claim 3, Meister asserts that trial counsel rendered ineffective assistance by failing to present evidence that certain parts of Meister's confession were inaccurate or uncorroborated and, therefore, that the confession must have been false. Specifically, Meister contends that counsel should have supported the false-confession defense by submitting evidence of the following:

(a)      Police were unable to corroborate Meister's statement in his confession that he announced to his co-workers at Pizza Pipeline that he would kill someone for $1,000;

(b)      Tonya's emotional distress and the difficulties with her relationship with Linderman were commonly known among Pizza Pipeline's employees, not known only to Meister;

MEMORANDUM DECISION AND ORDER - 19

(c)     Linderman's pager number, which was found in Meister's wallet, could not have been placed there before the murder because the number had not been activated until two months after the murder;

(d)     Meister confessed that, after the shooting, he saw a police car on the North Polk Extension, but there was no corroboration that there was, in fact, a police car at that time and place;

(e)     Meister confessed that he deviated from the North Polk Extension into a field, but law enforcement did not find evidence supporting this; and

(f)     Meister confessed that he discarded clothing in the fields around the North Polk Extension, but law enforcement found no such clothing even after searching the area both on foot and by helicopter.

*Pet.* at 6.

At the first trial, the defense relied on this evidence—or lack thereof—in asserting that Meister's confession could not be true. After the Idaho Supreme Court held that the trial court erred in analyzing the alternate-perpetrator evidence, defense counsel chose in the second trial to focus more on the alternate-perpetrator defense.

The defense still took the position that the confession was false—and called an expert witness to testify about coercive interrogation tactics that can lead to a false confession—but also presented evidence from which the jury could have concluded that Lane Thomas, not Meister, killed Tonya. Meister argues that counsel should have focused on the false-confession defense by more emphatically bringing out the above alleged inconsistencies in Meister's confession.

MEMORANDUM DECISION AND ORDER - 20

### A.      Factual Basis for Claim 3

In his confession to police, Meister included the following details:

- While at work at Pizza Pipeline, Meister told a group of people that he would kill someone for money. Jesse "Shorty" Linderman later approached Meister and hired him to kill Tonya for $1,000. Linderman paid Meister $500 up front, with the remaining $500 to be paid after the murder, and offered Meister an extra $100 if he committed the murder before Christmas.

- Within a week before the murder, Meister bought a High Point 9mm handgun and a box of Ultramax remanufactured ammunition from Michael Garrison. (Meister had initially told police that he had sold the gun to an unknown man at a party sometime before the murder.)

- The night of the murder, Meister put on concealing clothes and walked to Tonya's residence up Highway 95. The front door was locked, so he went to the back. He knocked, announced himself as "Joe," and shot Tonya twice when she opened the door.

- After the murder, Meister ran through a field and over a hill toward North Polk and then saw a police car. Meister threw the gun in a garbage can that was outside a house ready for collection and discarded his outer layer of clothing on his way back from the murder scene.

*See State's Lodging C-16* at 2065–72.

Defense expert Dr. Offshe testified about interrogation techniques that can lead to a false confession. In presenting this evidence, counsel gave the jurors an opportunity to learn why a person might confess to a crime he did not commit. Dr. Offshe testified there is a pre-admission phase of interrogation and a post-admission phase, and the breaking point is when the subject stops resisting the interrogators' questions or narrative. *State's Lodging C-17* at 2952–55. The interrogator appears utterly confident, sits between the subject and the door of the interrogation room, and introduces evidence ploys and crime scenarios to the subject. *Id.* at 2957–2967. According to Dr. Offshe, even innocent people

MEMORANDUM DECISION AND ORDER - 21

can be highly motivated to initially confess—and to stick to the false confession even in the post-admission phase—because they think it is the only way to get leniency. *Id*. at 2997–3000.

Defense counsel then presented evidence that Meister's confession was false and may have been coerced. Meister testified about his interview with police and said he was resigned to what the police wanted him to say and felt compelled to confess falsely in order to save his life:

> They were going to make their case, you know. They had this evidence. This—I didn't know what to make of these—of a lot of this stuff. People seeing me on the side of the road, Shorty's telling me—saying that I—that I—you know, that I—that I did the murder, which, of course, wasn't true, but I didn't know what to make of all that.

> And he talked about the Shakelford case [a different murder case where the defendant initially received the death penalty]. And he was telling me that this was the time. This is the time to come clean to avoid the death penalty.

*State's Lodging C-18* at 3224.

Meister went on:

> I didn't really feel I had a choice in the state of mind that I was in at that time. I felt lost, like I—you know—all the—the circumstances as they had described them were against me. What could I do? You know, I didn't want to leave. I didn't want to give up the chance…. I figured that they would come and arrest me, you know. Not necessarily them, but, you know, an armored SWAT team would come and break in the door at my house and arrest me …. And so, I told them what they wanted to hear.

*Id*. at 3239.

Trial counsel argued to the jury that Meister was coerced into a false confession. He noted that the detectives "sat 'knee-to-knee' with Meister, attacking him for forty minutes"; that, "after hours of interrogation, officers presented Meister with the idea" that Linderman had hired him to kill Tonya; and that the officers "offered Meister leniency and said that [Linderman], not Meister, was the bad person and that they wanted to help Meister." *State's Lodging F-4* at 3. Counsel connected this description of the interrogation with Dr. Offshe's testimony regarding coercive tactics: "That's the point from Dr. [Offshe]. And that's the point you get to by doing all of the things that [the officers] did in their interrogation of him to result in a false confession. They made it hopeless, and they provided him an out." *Id*. (second alteration in original).

Counsel also pointed out to the jury that the evidence did not match—or at least did not corroborate—some of the details Meister gave in his confession:

> … Where are the witnesses from Pizza Pipeline that heard [Meister] offer to kill someone for $1,000? Where are they?
>
> The confession said, I was at work, a bunch of other people around, and I said I would do this. If that had happened, don't you think they would be here? …
>
> Why would [Meister] say he ran over the next hill and over the next hill when the tracks lead down the middle of Polk? If he ditched the clothes in the field like he confessed to, where are they?

*State's Lodging C-19* at 4045.[4] That is, although the two primary points of defense were the alternate-perpetrator evidence and the evidence of a coercive interrogation, counsel

---

[4] Counsel's arguments that the facts of the case did not support some details of Meister's confession were all based on the evidence, or lack of evidence, that was produced at trial. For example, law enforcement

still brought to the jury's attention the lack of evidence supporting certain details Meister offered in his confession.

### B.    State Court Decision

In dismissing Meister's post-conviction petition, the trial court found that "defense counsel tactically forwent evidence that the confession was false in order to focus on two other defense theories, an alternative perpetrator theory and a defense that the confession was coerced." The state district court held that this tactical decision was not objectively unreasonable and, therefore, that counsel did not perform deficiently. *State's Lodging F-4* at 19.

The Idaho Court of Appeals agreed and rejected Claim 3, noting that the choice "of what evidence should be introduced at trial" is a strategic decision that is presumed reasonable. *Id.* The court held that counsel's decision—to focus primarily on the alternate perpetrator evidence and to focus more on the alleged coerciveness rather than the falsity of the confession—did not constitute deficient performance under *Strickland*. *Id.* at 20.

In so concluding, the state appellate court noted that Claim 3 rested—as it does here—primarily on "various testimonies from the first trial, which were not presented at the second trial." *Id.* Meister essentially contended that "counsel was ineffective in the second trial because counsel did not use the same strategy and evidence as was presented and used in the first trial." *Id.* at 18 n.3.

---

professionals testified that they did not find the clothes that Meister said he discarded on his flight from the murder scene. Defense counsel also called the helicopter pilot who followed the trail the morning after the murder, who testified that there was no clothing along the route that the murderer took. *State's Lodging C-18* at 3637–42.

The court of appeals emphasized that "counsel had the hindsight of the previous trial in which to make tactical and strategic decisions upon which to base [Meister's] defense." *Id*. at 20. Having previously—and unsuccessfully—tried a defense focused only on a supposedly false confession, defense counsel made a reasonable strategic decision in the second trial to focus on the newly-available alternate-perpetrator defense. *Id*. at 19–20.

The Idaho Court of Appeals described Claim 3 as little more than second-guessing defense counsel's strategic decisions "and listing the various ways in which counsel could have better tried the case." *Id*. at 20. The court found no evidence suggesting "that counsel's decisions resulted from inadequate preparation, ignorance of the law or other shortcomings." Finally, the court held that Meister had not rebutted the *Strickland* presumption that trial counsel's "tactical decisions relating to the introduction of evidence regarding the false confession defense fell within the objectively reasonable range." *Id*.

The court of appeals also noted that defense counsel did not, in fact, ignore the false-confession defense. Counsel "emphasized the contradictions in Meister's actual confession vis-a-vis the trial evidence" in an attempt to show the confession could not be true. *Id*. Counsel explained in closing argument "that Meister claimed to see a police vehicle on a road while fleeing when, in fact, no police vehicle was on that road," that he "confessed to throwing away the bullets as he fled, yet several witnesses testified that Meister offered to give them bullets in the following days, and that he "claimed he discarded his clothes in the field, yet no clothes were ever found." *Id*. Counsel concluded

by arguing that the coercive circumstances testified to by Dr. Offshe "provide for, create the circumstances of a false confession." *Id*.

In light of the foregoing, the Idaho Court of Appeals held that defense counsel's performance satisfied the Sixth Amendment.

### C.     The State Court's Rejection of Claim 3 Was Not Unreasonable under AEDPA

The Idaho Court of Appeals found, as a factual matter, that defense counsel's decision to focus on the alternate-perpetrator defense was a tactical one. The court also found that counsel made this decision after investigation and considering the experience of the first trial. Because Meister has not shown that these findings are rebutted by clear and convincing evidence, this Court is bound by them. As a result, the state court's decision on Claim 3 was not based on an unreasonable factual finding under 28 U.S.C. § 2254(d)(2).

The court of appeals correctly cited *Strickland* as the standard governing ineffective assistance claims. Further, there is no Supreme Court precedent with materially indistinguishable facts that would have required all fair-minded jurists to conclude that Meister's counsel's performance with respect to the false-confession defense was objectively unreasonable. *See* 28 U.S.C. § 2254(d)(1); *Bell*, 535 U.S. at 694. Thus, the state court's rejection of Claim 3 and its subparts was not contrary to clearly established Supreme Court precedent.

The only remaining question, then, is whether the rejection of Claim 3 was an unreasonable application of *Strickland* under 28 U.S.C. § 2254(d)(1). The Court concludes it was not.

There is nothing in the record to counter the state court's conclusion that counsel made a reasonable tactical decision to focus primarily on the alternate perpetrator defense. Defense counsel chose to bolster the alternate perpetrator defense with evidence that the confession was coerced. This decision—made after Meister was convicted in the first trial, when the defense focused primarily on the false-confession defense—fell well within the wide range of reasonably competent representation. Counsel learned what did not work from the first trial and made a reasonable decision to change tactics in the second trial. That another strategy might have produced a better outcome does not support a conclusion of deficient performance. *See Bashor*, 730 F.2d at 1241 ("[C]ounsel [chose not to argue lesser included offenses to the jury] not out of ignorance of the law but as the result of a tactical decision that the jury should be forced to the choice of finding Bashor guilty of deliberate homicide or acquitting him outright. With the benefit of hindsight we know that this strategy was incorrect; however, it did not constitute ineffective assistance of counsel.").

Further, counsel *did* point out to the jury that the prosecution failed to present evidence corroborating many of the details Meister gave in his confession. Thus, counsel performed reasonably in presenting three theories upon which the jury could have found reasonable doubt: (1) Lane Thomas committed the crime; (2) Meister's confession was coerced; and (3) Meister's confession was false. That counsel chose to focus primarily on

the first two of these defenses, while also not abandoning the false-confession defense, does not mean counsel performed deficiently.

Meister argues that it was professionally unreasonable to present an alternate-perpetrator defense without *first* showing conclusively that the confession was false. He contends that they jury "needed first to be convinced by powerful evidence that the confession was false, before any other defense would gain traction." Dkt. 31 at 26. However, this is not necessarily true—if the jury had first been persuaded that Lane Thomas had killed Tonya, then it necessarily *also* would have been persuaded that Meister's confession was false.

Simply put, the double deference that applies to defense counsel's decisions prohibits the Court from granting habeas relief on Claim 3. *See Pinholster*, 563 U.S. at 190.

### 3.    Meister Is Not Entitled to Habeas Relief on Claim 4

Claim 4 asserts that Meister's trial counsel was ineffective based on counsel's failure to present additional evidence of Meister's purported alibi. White testified that he and Meister went to get pizza and saw that the Pizza Pipeline store was closed. Meister claims counsel should have called additional witnesses to establish that Pizza Pipeline was, indeed, closed for at least some time on the night of the murder.

#### A.    *Factual Basis for Claim 4*

Tonya was killed around 10:15 p.m. on December 11, 2001. Meister testified that he was at home at that time with his roommate, Jeremy White. White corroborated that testimony. White testified Meister was at home between 9:30 and 10:00 or 10:30 p.m.,

though White acknowledged that he had previously given different timelines. White also stated that sometime before 11:00 p.m., Meister and White called Pizza Pipeline but did not get an answer. According to White, they drove to Pizza Pipeline, saw that it was closed, and then drove to Papa John's to pick up pizza. *State's Lodging C-18* at 3672–74.

Other witnesses corroborated some of White's and Meister's testimony about this timeline. Jennifer Young testified that she went to White and Meister's house between 10:30 and 11:00 p.m. and that both men were there and had just finished eating pizza. *Id.* at 3723–28. Heather Hart testified that she called Pizza Pipeline twice and that no one answered the phone the first time she called—lending support to White's testimony that Pizza Pipeline was closed when he and Meister called and then drove to get pizza. *State's Lodging C-15* at 844–63.

In closing argument, defense counsel relied on this evidence as support for Meister's alibi:

> What about the alibi? ...
>
> …
>
> Jeremy White says he called [Pizza Pipeline], no answer. Heather Hart says she called, no answer. [Another witness] said, when people called, we answered. We put them on hold. Put one person on hold and go to the next one. So, I'll tell you that the evidence is very, very consistent with the fact that the perception, at least, was that the store was closed. Heather Hart even thought it was closed.
>
> Jeremy White's testimony, you heard—you heard it said in his statement, you heard him on the stand. Home between 9:00 and 10:00. Let's go 8:30 to 10:30. It still can't—you cannot have it both ways. [Meister] cannot get home by 10:30 if he was out at the trailer park. He can't. He's home between

> 9:00 and 10:00, because that's when Jeremy White arrives. That's when he sees [Meister] … playing dice and drinking beer.
>
> Jeremy White then is exactly consistent with, they called Pizza Pipeline, no answer. They go to Papa John's after checking—after going by the Pizza Pipeline, and then they go home. Jennifer … has [Meister] home in the crucial timeframe….

*State's Lodging C-19* at 4033–35. Counsel emphasized that Meister could not have committed the murder and been home by the time to which White testified.

### B.   State Court Decision

On appeal from the dismissal of his post-conviction petition, Meister argued that counsel should have called two additional witnesses that purportedly supported Meister's alibi. First, Rigel Glassbrook testified at the first trial that Pizza Pipeline was closed for a short time on the night of the murder. Counsel did not call Glassbrook at the second trial. This testimony could have bolstered the other evidence that Pizza Pipeline was closed—which is consistent with Meister's and White's testimony. Meister also argued counsel should have called Joe Rausch, another employee at Pizza Pipeline, who would have testified that he was told by police to close the store because Linderman would not be coming back to work and that he saw Meister and White in the parking lot when they went to get pizza.

The Idaho Court of Appeals found that trial counsel made a tactical decision not to call these witnesses. Counsel did present evidence that Meister was at his home when Tonya was killed at 10:15 p.m. Two witnesses testified that Meister was seen at home sometime between 9:30 and 11:00 p.m., and Jennifer Young stated that Meister and

White had just finished eating a pizza when she arrived at Meister's house "close to 11 p.m." *State's Lodging F-4* at 21–22. There was also evidence that Pizza Pipeline was in fact closed for a portion of the night, which corroborated Meister's and White's testimony about going to get pizza.

The state court rejected Claim 4 for similar reasons as Claim 3, concluding that counsel's strategic decision not to call Glassbrook and Rausch was reasonable. Once again, there was no evidence suggesting that "counsel's decisions resulted from inadequate preparation, ignorance of the law, or other shortcomings," and Claim 4 was simply a means of "second-guessing trial counsel's tactical and strategic decisions during the second trial and listing the various ways in which counsel could have better tried the case." *Id*. at 22. The court of appeals held that the presumption of reasonable competence applied and that counsel's failure "to introduce additional alibi evidence did not fall below an objective standard of competence." *Id*.

## C.    The State Court's Rejection of Claim 4 Was Not Unreasonable under AEDPA

As with Claim 3, Meister has not rebutted the state court's finding that counsel's decision not to call the two additional witnesses was a strategic one. And a fair-minded jurist could certainly conclude that this strategic decision was objectively reasonable. *See Richter*, 562 U.S. at 101.

There was already evidence in the record that Pizza Pipeline did close for at least a portion of the evening—including from a prosecution witness. There was testimony that Meister was home at the time of the murder. Counsel presented the jury with an adequate

basis on which to believe Meister's alibi—the jury simply did not do so. Unfortunately for Meister, he had previously told police that he and White went to get pizza around *midnight*, not before 11:00 p.m., and the jury obviously did not believe that Meister was with White at the crucial time of 10:15 p.m.

Counsel's representation with respect to Meister's alibi did not fall below the "wide range of reasonable professional assistance" required by the Sixth Amendment. *Strickland*, 466 U.S. at 689. Therefore, the Court must deny Claim 4.

**4.     Meister Is Not Entitled to Habeas Relief on Claim 5**

In Claim 5, subsections (a) and (b), Meister challenges trial counsel's introduction of prejudicial evidence.

### A.     *Claim 5(a): Linderman's Pager Number*

Meister first argues that counsel improperly introduced a photograph, which later led to testimony that Meister may have had Linderman's pager number in his wallet at the time of his arrest.

#### i.     Factual Basis of Claim 5(a)

Meister stated in his confession that, before the murder, Linderman had "given him a phone number, which he put in his wallet." *State's Lodging F-4* at 34. While cross-examining Detective Kurtis Hall, defense counsel introduced photographs of the contents of Meister's wallet at the time of his arrest. *State's Lodging C-16* at 1968–71; C-24; C-25. One of the photos showed piece of paper with a phone number on it. This number turned out to be a pager number belonging to Linderman.

On redirect—over defense counsel's objection—Hall testified that when he first examined Meister's wallet, he remembered coming across a phone number connected to Linderman but was unsure if it was the number shown in the photo. State's Lodging C-16 at 2000. Meister had confessed that he had Linderman's number before the murder, so the jury could have inferred that the number found in Meister's wallet when he was arrested was Linderman's and that Meister had that number in his possession at the time of the murder. However, the pager number found in Meister's wallet, while indeed belonging to Linderman, was not activated until two months *after* the murder. *State's Lodging E-18* at 3967–68. Therefore, the number could not have been in Meister's possession at the time of the murder.

Other than this brief testimony by Hall, there was no other testimony regarding the phone number, and neither defense counsel nor the prosecution again called attention to the issue.

  ii. <u>State Court Decision</u>

The Idaho Court of Appeals found that counsel made a tactical decision not to highlight the issue with the pager number:

> In his first trial, trial counsel elicited testimony regarding the pager number; however, the record reflects that in the second trial neither counsel nor the State highlighted this evidence. The only reference to the pager number occurred when the prosecutor asked two questions regarding the number. There were no follow-up questions[,] nor was the number brought up again at any other point in the trial or closing.

*State's Lodging F-4* at 35. Moreover, trial counsel objected to the prosecution's questions about the phone number. For these reasons, the court held that Meister had not rebutted the presumption of reasonable professional assistance.

The state appellate court also determined that any error with respect to the phone number was not prejudicial. Meister "provide[d] no evidence that the outcome of the trial would have been different if this additional piece of evidence [the pager number's inactivity prior to the murder] were introduced at trial." *Id.*

### iii.       The State Court's Rejection of Claim 5(a) Was Not Unreasonable

The Idaho Court of Appeals reasonably applied *Strickland* in determining that defense counsel's performance was not deficient. There is nothing to suggest that counsel's decision not to call attention to the pager number was objectively unreasonable.

The state court's decision on the prejudice prong of *Strickland* was also reasonable under AEDPA. Meister and Linderman knew each other and worked together, so the fact that Meister may have had Linderman's pager number was not especially probative. On the other hand, the evidence against Meister was overwhelming:

- Meister confessed his crime to police and to at least two other people, and the confessions to the police and to James Collyer both included remarkable detail about the crime.

- The footprints running away from the murder scene were consistent with the size and brand of shoes Meister owned and was known to favor.

- The week before the murder, Meister had purchased the same type of gun and the same type of ammunition that was used in the murder. Meister later

tried to give some of that ammunition away, stating he thought it was used in a crime.

- Before the murder, witnesses saw a person walking along the road that Meister confessed to taking when he walked to Tonya's home. The person generally matched Meister's description, and the person's clothes were not inconsistent with the clothes Meister confessed he was wearing that night.

Given all of this evidence, Meister simply has not established a reasonable probability of a different result if his counsel had highlighted the pager number issue. At the very least, a fair-minded jurist could have agreed with the Idaho Court of Appeals and concluded that Meister did not establish *Strickland* prejudice on this issue. 28 U.S.C. § 2254(d)(1); *Richter*, 562 at 101. Consequently, Claim 5(a) must be denied.

### B.    Claim 5(b): Meister's "Sick Sense of Humor"

In Claim 5(b), Meister challenges counsel's introduction of a previous statement, by witness Duane Scott, that Meister had a "sick sense of humor and delighted in things associated with gore and death." *Pet*. at 8.

### i.    Factual Basis of Claim 5(b)

Based on previous testimony offered by Duane Scott, defense counsel moved to exclude any testimony by Scott that Meister told "sick sex jokes" and "laugh[ed] or jok[ed] about people killing people." *State's Lodging C-16* at 1731. The prosecution responded that it did not intend to elicit that specific evidence, but that generally Scott would testify that Meister told controversial jokes to get a reaction out of people. Defense counsel was satisfied with that assurance and acknowledged that there would necessarily

be testimony about why Scott had not earlier reported certain things that Meister had allegedly told Scott. *Id*. at 1732.

Scott testified that Meister confessed to killing Tonya but then said he was only kidding. Scott also testified that at some point the week of the murder, Scott saw Meister at home wearing all black. When Scott asked Meister where he was going, Meister responded, "I'm going to take care of some dirty business" and told Scott that Scott "[didn't] want anything to do with it." *Id*. at 1763. Scott had not previously reported this "dirty business" encounter.

When cross-examining Detective Hall, defense counsel asked about a phone interview that Hall had done with Scott and had Hall review his notes from that interview. Hall testified that his interview notes revealed the following:

- Scott had told Hall that Meister "had a sick sense of humor" and "would talk and laugh about things that were gory, bloody or inappropriate to a conversation."

- Scott said Meister's personality "didn't seem to change" after the murder.

- Scott said Meister "always seemed composed and confident, and Scott did not notice any evidence of Meister being under stress."

- Scott told Hall he did not think Meister had any great need for money.

- Scott said he thought that Meister might have mentioned going to Linderman's residence at least once.

*State's Lodging C-16* at 1839–40.

MEMORANDUM DECISION AND ORDER - 36

Counsel pointed out that, even though Scott told Detective Hall all of these things, he did *not* report until later that Meister confessed to murdering Tonya. Defense counsel continued walking Hall through his other interviews with Scott, establishing that Scott had not reported the event where Meister allegedly dressed all in black and said he was going out to do "dirty business." *Id*. at 1840–45.

ii.      <u>State Court's Decision</u>

The Idaho Court of Appeals held that counsel's questioning about Scott's previous statements, specifically the "sick sense of humor" comment, did not constitute deficient performance. Although bringing up the "sick sense of humor" comment was "potentially not the most strategic decision," the court held that it did not fall below an objective standard of reasonableness. *Id*. at 37. The court of appeals also determined that Meister had failed to show prejudice from counsel's introduction of Scott's comment. *Id*.

iii.      <u>The State Court's Rejection of Claim 5(b) Was Not Unreasonable</u>

Though other defense attorneys might have made different decisions, a fair-minded jurist could conclude that referring Detective Hall to his previous interviews with Scott was a reasonable tactical decision. *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."). By taking Detective Hall through all of Scott's interviews, counsel was able to establish that, despite all of the things Scott had told Hall about Meister, he did *not* initially report Meister's confession to Scott and never mentioned the supposed "dirty business"

comment. *State's Lodging F-4* at 36. In doing so, counsel was able to call into question Scott's testimony by attacking his credibility.

Further, as the state court found, counsel's introduction of the "sick sense of humor" comment "could have been an attempt … to depict Meister's [confession to Scott] as not being serious but as being humorous." *Id*. at 37. Defense counsel used Hall's previous interviews with Scott both (1) to attack Scott's credibility and imply that Scott was lying, and (2) to suggest that Meister was only joking when he told Scott he killed Tonya. The double deference of *Strickland* and § 2254(d) requires the Court to conclude the state court reasonably determined that counsel's performance was not deficient with respect to Scott's "sick sense of humor" comment.

Further, for the same reason as Claim 5(a), the prejudice determination of the state court of appeals as to Claim 5(b) was also a reasonable application of *Strickland*. Considering all of the evidence against Meister as recounted above—including his detailed confession—the Court does not find a reasonable probability that, if counsel had refrained from introducing the "sick sense of humor" evidence, Meister would have been acquitted.

### 5.    Meister Is Not Entitled to Relief on Claim 6

Claim 6 alleges that Meister's trial counsel rendered ineffective assistance by failing to object to the following:

(a)    the undisclosed testimony of Officer Scott Mikolajczyk regarding

Linderman's emotional state the night of the murder;

MEMORANDUM DECISION AND ORDER - 38

     (b)       the prosecutor's questions to Brian Keim regarding Asatru (also called Odinism), a pagan religion which both Keim and Meister practiced;

     (c)       the prosecutor's statements in closing argument regarding Meister's credibility, and the prosecutor's allegedly vouching for the credibility of the interrogating officers;

     (d)       repetitive or cumulative evidence presented during the prosecution's rebuttal case regarding Meister's August 2002 interview;

     (e)       the prosecutor's statements in closing argument that Meister tailored his testimony to match the circumstances described by Dr. Offshe with respect to coercive interrogation tactics; and

     (f)       the prosecutor's statements in closing argument that Meister received due process rights, while the victim did not.

*Pet*. at 9.

For the reasons that follow, the Court concludes that the Idaho Court of Appeals reasonably applied *Strickland* in rejecting each of the sub-claims in Claim 6. *See* 28 U.S.C. § 2254(d).

**A.      *Claim 6(a): Testimony about Linderman's Emotional State***

Claim 6(a) asserts that defense counsel should have objected to a police officer's testimony about Linderman's emotional state the night of the murder.

       i.      <u>Factual Basis of Claim 6(a)</u>

Officer Scott Mikolajczyk testified that, on the night of the murder, he spoke to Tonya's boyfriend, Jesse Linderman. The officer stated that Linderman was concerned

about his place of employment, Pizza Pipeline, having to close without Linderman present. The officer also testified that Linderman showed no emotion after being told of Tonya's death. *State's Lodging C-15* at 1136–38. Meister's counsel did not immediately object.

The next day, defense counsel moved for a mistrial or to strike Officer Mikoajczyk's testimony, arguing that the prosecution had not disclosed Linderman's statements as required by Idaho Criminal Rule 16(b) and that, therefore, defense counsel was deprived of the opportunity to object on hearsay grounds outside the presence of the jury. *State's Lodging C-8* at 1776–81. The trial court denied Meister's motion because there was no recorded statement to be disclosed under Rule 16(b) and because Linderman's statements were admissible under the present-sense-impression exception to the rule against hearsay. *Id.* at 1806–08.

      ii.      <u>State Court Decision</u>

In Claim 6(a), Meister argues that counsel should have objected to the testimony immediately, and under a different subsection of I.C.R. 16(b), rather than later filing a motion for a mistrial.

The Idaho Court of Appeals rejected this claim, noting that the state district court had already determined that, even if counsel had made the objection, the court would have overruled it. Relying on this fact, the court held that Meister had not shown that any such objection would have been sustained. Therefore, the court held that Meister had not shown *Strickland* prejudice resulting from counsel's failure to object. *State's Lodging F-4* at 24–25.

iii.     The State Court's Rejection of Claim 6(a) Was Not Unreasonable

The state court's decision that Meister could not show prejudice from

Mikoajczyk's testimony was reasonable under 28 U.S.C. § 2254(d). *Strickland* requires a

reasonable probability of a different result. 466 U.S. at 694. Here, the evidence in the

record establishes that the trial court most likely would have permitted the testimony

from Officer Mikoajczyk *even if* counsel had objected in the manner Meister suggests.

*See State's Lodging E-21* at 4466–67 ("The Petitioner's claim of deficiency is based upon

the Petitioner's argument that counsel based the motion on the incorrect rule of law….

[T]here is no evidence the Court would have granted the motion based on the alternate

rule proposed by Meister."). Thus, the state court's rejection of Claim 6(a) was not based

on an unreasonable application of clearly established Supreme Court precedent.

## B.     Claim 6(b): Alleged Appeals to Religious Prejudice through the Cross-Examination of Brian Keim

In Claim 6(b), Meister asserts that defense counsel should have objected, during

Brian Keim's testimony, to the prosecutor's questions about Keim's and Meister's

religious affiliations and beliefs.

i.     Factual Basis of Claim 6(b)

Brian Keim, one of the defense witnesses, had been incarcerated with Lane

Thomas after Meister was initially convicted. Keim testified that Thomas had confessed

to the murder of which Meister was accused. *State's Lodging C-18* at 3597–98.

Keim knew Meister from prison. They both studied Odinism and attended

Odinistic religious classes. *Id*. at 3594–96. Before Keim's testimony, defense counsel

moved to exclude inquiry into Keim's and Meister's religious beliefs, arguing that it could "create potentially some very strong feelings about Mr. Meister amongst any strong Christians who tend not to tolerate any other form of worship or religion." *Id.* at 3579. The trial court denied the motion, stating that the potential bias of the witness toward Meister was "a legitimate area to inquire to, as to what kind of contact they've had, how friendly they were to each other, what kind of organizations they were in together, [and] the amount of contact." *Id.* at 3581.

On cross-examination of Keim, the prosecutor asked Keim about his religious beliefs and his association with Meister:

> Q.      And part of the Odinistic brotherhood is loyalty to other brothers in the Odinistic belief; isn't that true?
>
> A.      You give loyalty to people that—that deserve it. And generally, people that have the same beliefs and are in good standing get that, yes.
>
> Q.      And so, as a brother in Odinism, you and Mr. Meister, you have loyalty to Mr. Meister; isn't that true?
>
> A.      As much as he deserves it, yeah.
>
> Q.      Okay. And you indicated that you may have written to Mr. Meister when you were out on parole?
>
> A.      I might have, but I can't remember specifically doing that. But it's possible that I could have ….

*Id.* at 3612–13.

The prosecutor went on to question Keim as to whether Odinism held certain tenets regarding sin and repentance:

> Q.      And isn't it true that that the Odinistic belief is that sin is denied and contrition is denounced, that Odinists see repentance as a mark of weakness?
>
> A.      I don't know about that. I don't remember that, but I haven't really—I've kind of drifted away from it a little bit over the years. … But I mean, the typical idea of, like, sin and stuff like that is—that's generally a Christian belief or Muslim or Jewish, you know.
>                It's—and Odinism is a pagan religion so their idea of sin has to do with violating the Nine Noble Virtues ....
>
> ....
>
> Q.      Mr. Keim, isn't it true that the fact that you're testifying on behalf of Mr. Meister is going to look well with all those that are in the Odinistic faith?
>
> A.      Well, first of all, there's—you know, there are crimes in prison that have no honor. One of those is killing a defenseless girl, okay. So if—if they believe that he did it and they believe that I was helping him get away with it, there's no honor in that. So, that wouldn't help me at all.
>
> Q.      But, of course, Odinism doesn't see repentance—or sees repentance as a mark of weakness?
>
> A.      Well, that's—I don't know about that.

*Id*. at 3612–14, 3622. Defense counsel did not object during this testimony.

Defense counsel did, however, file another motion in limine regarding Meister's religious beliefs, this time seeking to limit the prosecutor's closing argument on that issue. The trial court granted the motion in part. The prosecutor was prohibited from arguing that, "because by virtue of the religion and the religious practices, itself, that there's some credibility issue." *State's Lodging C-19* at 3948. However, the court held that the prosecutor "could certainly make argument based on evidence that they were in

an organization together. I don't think—whether it's Odinism or some other association really doesn't matter. They can make that argument relative to credibility." *Id*.

The state followed the trial court's ruling during rebuttal closing argument. The prosecutor argued that Keim was biased because Keim and Meister were friendly and knew each other from taking the same classes—the prosecutor did not base her argument on any purported Odinistic beliefs themselves:

> Now, you also have to look at Mr. Keim and look at any possible bias he has in favor of Meister. They were in the same classes together. Now they wanted to, I'm sure, downplay the fact that they were in the same class.
>
> You know, it's no big deal to have—be in class. But they were in—it was the only class of that kind offered in that institution, in the institution they were in; that it was a weekly class; that this was over about three years or so; and that he and Mr. Meister went to about 70 percent of these classes together.

*Id*. at 4074.

After Meister was convicted, defense counsel moved for a new trial, again contending that the testimony and statements about Odinism violated Rule 610 of the Idaho Rules of Evidence. *State's Lodging F-4* at 11. Rule 610 states that "[e]vidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility." I.R.E. 610. Counsel argued that Keim's responses to the prosecutor's questions "impermissibly tainted Meister's character" by implying that "due to his religion, he had a deviant moral character; owed a duty of loyalty to other practitioners of the pagan religion; and due to his religious affiliation, he associated with white racists." *State's Lodging F-4* at 11–12. The trial court denied Meister's motion for new trial.

MEMORANDUM DECISION AND ORDER - 44

ii.        State Court Decision

In Claim 6(b), Meister asserts that defense counsel should have objected to the religious line of questions during Keim's testimony, rather than relying on it in a motion for a new trial. The Idaho Court of Appeals rejected this claim.

The state court accepted the trial court's finding that "the State properly attempted to establish bias through this line of questioning" and did not improperly "imply[] that Meister and [Keim] were undesirables and less credible by virtue of their religion." *State's Lodging F-4* at 26 (internal quotation marks omitted). The court held that Meister had not shown *Strickland* prejudice because the "evidence [of Keim and Meister's association through religious classes] was admissible to prove bias." *Id.* Thus, Meister had not shown a reasonable probability that a contemporaneous objection would have been sustained.

iii.        The State Court's Rejection of Claim 6(b) Was Not Unreasonable

The Idaho Court of Appeals reasonably applied *Strickland* in determining that Meister could not establish prejudice from counsel's decisions with respect to the religious questions. Given the trial court's multiple rulings that the evidence was admissible to show bias, any objection counsel might have made *during* Keim's testimony—in addition to bringing up the issue both before and after the testimony— would have been overruled. Therefore, Claim 6(b) must be denied.

MEMORANDUM DECISION AND ORDER - 45

###### C.    *Claim 6(c): Closing Argument Regarding the Respective Credibility of Meister and the Interviewing Officers*

In Claim 6(c), Meister contends trial counsel was ineffective in failing to object to a portion of the State's closing argument in which the prosecutor purportedly offered a "bare personal opinion that [Meister was] not credible" and that Meister had "more incentive" to lie about the August 2002 interview than law enforcement officers did. *Pet*. at 9.

###### i.    Factual Basis of Claim 6(c)

In closing argument, the prosecutor argued that Meister had a motive to lie and that his testimony was not believable:

> The defendant is asking you to believe that police officers asked him about a murder he didn't do, and he admits it. He wants you to believe he was lying when he confessed. And then he takes the witness stand with everything to gain by lying, and he says he didn't do it. He wants you to believe he's now telling the truth. That's all backwards.
>
> There's not—there is so much to say, there were so many contradictions, so much that is unbelievable in the defendant's testimony, I cannot possibly address it all; so I'm going to pick some of the most significant points.

*State's Lodging C-19* at 3989–90.

The prosecutor went on to point out the following inconsistencies with Meister's story, among others:

- Though Meister testified he intended to sell (and did sell) the gun, he previously testified that he threw away everything else in the gun's box—

the manual, the sight, and the tools—instead of keeping them with the gun he was going to sell.

- Years later, the occupant of Meister's former residence found a manual for a High Point 9mm semiautomatic handgun, as well as tools for that type of gun, under the refrigerator. Faced with this new evidence, Meister offered a new explanation—as described by the prosecutor, Meister said that, at one point, "he tried to put the gun under the refrigerator, and maybe the manual and tools were somehow attached or stuck to the gun when he was stuck—sticking it under there." *Id.* at 3994.

- Despite testifying that he was lying in his confession, after that confession Meister agreed to attempt one-party consent calls to Linderman to get Linderman to incriminate himself in the murder-for-hire scheme. Meister even participated in discussions with the police to come up with ideas for what to say to Linderman.[5] *Id.* at 4005–06.

The prosecutor also argued that Meister's recorded confession "was clear, organized, consistent and compelling." *Id.* at 4010. The prosecutor then contrasted that confession with Meister's trial testimony:

> [Meister's testimony] was confusing. He was all over the map. He rambled, was inconsistent, and he was unbelievable.
>
> He had lots of time to come up with his trial testimony, and this was the best he could do. He said—he said he studied his

---

[5] Meister offered no explanation for why Linderman might incriminate himself in a murder-for-hire scheme if that scheme did not, in fact, exist. Meister simply said he agreed to attempt the calls because it was what the detectives wanted him to do. *See State's Lodging C-18* at 3241–42, 3345.

> prior testimony. He studied that of Westbrook as well, and
> others; yet, he had moments to put together a confession, and
> it was clear as a bell? That's the nice thing about the truth, is
> it comes out clearly because it's true.

*Id.*

The prosecutor also argued that law enforcement did not have a reason to lie about

what happened during the August 2002 interview:

> Now, Idaho law does not require recording of every
> interview…. And it is too bad [the entire interview] wasn't
> recorded, but it wasn't. But that doesn't mean that you can't
> weigh the testimony of [the detectives] against that of Mr.
> Meister. That's within your province as jurors to do so.
> Again, who has the most incentive to be dishonest about what
> happened?

*State's Lodging C-19* at 4069. Defense counsel did not object to this line of argument.

> ii.     State Court Decision

Meister contends in Claim 6(c) that defense counsel should have objected to these

credibility arguments offered by the prosecutor.

Prosecutors have a "duty to refrain from improper methods calculated to produce a

wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). They may not

state a personal opinion about the credibility of a witness or about the guilt of the

accused. *United States v. Young*, 470 U.S. 1, 18 (1985). However, prosecutors have

"reasonable latitude to fashion closing arguments, and thus can argue reasonable

inferences based on the evidence, *including that one of the two sides is lying.*" *United*

*States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir.) (emphasis added), *as amended on*

*denial of reh'g* (Apr. 15, 1993). That is, a prosecutor is permitted to argue as to the

credibility of witnesses if that argument is based upon the evidence adduced at trial, including reasonable inferences to be drawn from that evidence.

In considering Claim 6(c), the Idaho Court of Appeals found that the prosecutor's argument as to Meister's credibility was "drawn directly from testimony and evidence introduced at trial." *State's Lodging F-4* at 31. Noting that prosecutors are permitted to explain how "the evidence calls into doubt the credibility of particular witnesses," the state court held that the prosecutor "did not state [a personal] opinion regarding the truth or falsity of Meister's testimony. Nor did the prosecutor make reference to the credibility of the officer." *Id.* That is, the prosecutor's comments were not based on her personal opinion, but on the evidence and on the inferences that could be drawn therefrom. Therefore, the court held, Meister had not shown *Strickland* prejudice: trial counsel could not have been ineffective for failing to object because the comments were not inappropriate, and any such objection thus would have been overruled.

### iii.    The State Court's Rejection of Claim 6(c) Was Not Unreasonable

This prejudice determination of the Idaho Court of Appeals was a reasonable application of *Strickland*. The prosecutor never expressed a personal opinion as to anyone's credibility. Rather, she pointed out the reasonable inferences that could be drawn from the evidence: (1) that Meister's testimony made little sense, while his confession was clear and consistent, and (2) that, unlike Meister, law enforcement did not appear to have a motive to lie about the August 2002 interview. A fair-minded jurist could agree with the Idaho Court of Appeals that any objection to the prosecutor's argument on this issue would have been overruled. Therefore, Claim 6(c) must be denied.

**D.**     ***Claim 6(d): Repetitive or Cumulative Rebuttal Evidence from Law Enforcement about the August 2002 Interview***

Meister contends that the prosecutor improperly bolstered the credibility of law enforcement officers, regarding the August 2002 interview, by presenting the same evidence in rebuttal as these officers gave in the prosecution's case-in-chief. *Pet.* at 12–13. In Claim 6(d), Meister appears to argue that defense counsel should have objected that this rebuttal evidence violated Idaho Rule of Evidence 403 as needlessly cumulative. *See State's Lodging F-1* at 36.

   i.  <u>Factual Basis of Claim 6(d)</u>

The prosecution presented in its case-in-chief the testimony of Detectives Kurtis Hall and Edward Westbrook. These detectives described their recollections of the August 2002 interview, including the following:

- Meister received a full *Miranda* warning at the beginning of the interview.

- Meister was not promised leniency or threatened with the death penalty during the interview.

- The interviewing officers never mentioned that the person suspected to be the killer was seen wearing a plaid or flannel shirt. (Meister confessed that he wore a red plaid shirt the night of the murder, and witnesses testified that the person walking up the highway looked to be wearing a tan or yellow plaid or flannel shirt with stripes that were black, blue, or red.)

- Meister was lucid and sober during the interview.

*State's Lodging C-15* at 1532, 1549–50; *C-16* at 2025–31, 2093.

MEMORANDUM DECISION AND ORDER - 50

Meister's testimony, however, contradicted some of these points. Meister described the interviewing officers as suggesting to Meister that he wore "a yellow plaid shirt" when he went to kill Tonya. He said the officers told him that confessing was the only way he could avoid the death penalty. *State's Lodging C-18* at 3216–19, 3224–25, 3236–37. Meister also testified that he had taken another person's prescription pain medication on the day of the interview, indicating he was not in his right mind when he confessed. *Id*. at 3370–77.

In its rebuttal case, the prosecution once again called Hall and Westbrook to the stand. These officers repeated their testimony that Meister received *Miranda* warnings, that Meister was not threatened with the death penalty, that the officers did not mention a plaid shirt or any other clothing that Meister may have been wearing the night of the murder, and that Meister did not appear to be under the influence of drugs. *State's Lodging C-18* at 3794–97, 3839–45, 3847–51.

Toward the beginning of Hall's rebuttal testimony, defense counsel objected, arguing that the prosecution was simply "repeating their case in chief. I mean, it's beyond the scope of rebuttal." *Id*. at 3798. The trial court permitted the testimony to proceed. Meister's counsel did not object on this basis again.

  ii.  <u>State Court Decision</u>

Claim 6(d) appears to contend that trial counsel should have objected more often, or more forcefully, to the rebuttal testimony of Hall and should also have objected to the rebuttal testimony of Westbrook. The Idaho Court of Appeals rejected this argument, noting that "part of an effective trial counsel's duty is to determine appropriate challenges

and to avoid those which are either unlikely to be granted or to avoid objecting overzealously." *State's Lodging F-4* at 27. The court also held that the evidence was not unduly prejudicial, and that counsel reasonably declined to object because an attorney may properly decline "to object to the introduction of every piece of evidence or testimony as a precaution that failing to do so would be challenged in a post-conviction proceeding." *Id*. Because Meister had not shown either that "a reasonable attorney would have objected" or that further objection would have resulted in the exclusion of the testimony, Meister could not establish deficient performance or prejudice. *Id*.

iii. <u>The State Court's Rejection of Claim 6(d) Was Not Unreasonable</u>

A fair-minded jurist could conclude that defense counsel reasonably chose not to object more than once to Hall's rebuttal testimony. Further, given that the trial court permitted *Hall's* "repetitive" testimony, counsel reasonably chose not to object to *Westbrook's* rebuttal testimony. In addition, given the overwhelming evidence of guilt, Meister has not shown a reasonable probability that, had defense counsel succeeding in excluding the rebuttal testimony of the detectives, Meister would have been found not guilty. Therefore, Claim 6(d) must be denied.

**E. *Claim 6(e): Closing Argument about Meister "Tailoring" His Testimony***

In Claim 6(e), Meister asserts that counsel should have objected to the prosecutor's argument that Meister tailored his testimony to match Dr. Offshe's.

i. <u>Factual Basis of Claim 6(e)</u>

When the prosecutor was arguing to the jury that Meister's testimony about the August 2002 interview was not credible, she stated that Meister's description of the

interview was an attempt to match Dr. Offshe's description of coercive interrogation techniques and to make it seem as though Meister's confession were coerced: "Again, who has the most incentive to be dishonest about what happened? Mr. Meister tailored his testimony to [Dr. Offshe], his hired expert." *State's Lodging C-19* at 4069. Defense counsel did not object.

ii.    <u>State Court Decision</u>

The Idaho Court of Appeals rejected Claim 6(e) for the same reasons as the claim challenging the prosecutor's argument about the respective credibility of Meister and the detectives. That is, the prosecutor's "tailoring" comment was based on the evidence and was not a personal opinion:

> The prosecutor cross-examined Meister extensively regarding the falsity of Meister's confession, relying on numerous differences between his prior testimony and current testimony. Additionally, the prosecutor relied on other recorded statements regarding [Meister's] claim that his testimony was false.

*State's Lodging F-4* at 32. The court held that, because the prosecutor's comments were not improper, any objection by defense counsel would have been overruled; therefore, Meister had failed to establish ineffective assistance. *Id.*

iii.    <u>The State Court's Rejection of Claim 6(e) Was Not Unreasonable</u>

The Idaho Court of Appeals' decision on Claim 6(e) was, again, a reasonable application of *Strickland*. This Court's review of the entire trial transcript confirms that the prosecutor's closing argument was based entirely on the trial evidence, not on any personal opinion. Therefore, counsel did not perform deficiently by failing to object, and

Meister has not shown prejudice from counsel's decision in any event. Therefore, the Court will deny Claim 6(e).

### F.   Claim 6(f): Closing Argument that Tonya Did Not Receive Due Process

Meister argues in Claim 6(f) that defense counsel should have objected to "the prosecutor's closing argument that the jury should resent [Meister] for his due process trial rights, which due process the victim did not receive." *Pet*. at 9.

### i.   Factual Basis of Claim 6(f)

During closing argument, the prosecutor commented on Meister's constitutional rights and contrasted them with the rights of the victim:

> David Meister spent two full days on the witness stand. Tonya Hart was a 21-year-old girl whose testimony you will never hear, whose story you will never hear, because she's been silenced.
>
> Now, the defendant is entitled to many rights, the presumption of innocence, a trial by jury. The Court carefully reviews evidence to make sure everything you hear is proper for your consideration; that it's relevant; that it's not overly prejudicial. It's a very careful process, and it should be. It's designed to carefully protect the rights of the defendant. And that's what we in our society want.
>
> However, [the victim] had no such process. The defendant didn't give her any presumptions or protections. With two shots, he acted as her judge, jury and executioner without due process of law. But this time it's different because you can stop him. It's unpleasant—as unpleasant and difficult as it can be to render judgment, to look this defendant in the eye and say he's guilty, that's what the evidence compels you to do.

*State's Lodging C-19* at 4015–16.

ii.    <u>State Court Decision</u>

The Idaho Court of Appeals first noted that "wide latitude is given to counsel," particularly with respect to tactical decisions in closing argument, "because of the broad range of legitimate defense strategy at that stage." *State's Lodging F-4* at 33. A closing argument "should sharpen and clarify the issues for resolution by the trier of fact, but which issues to sharpen and how best to clarify them are questions with many reasonable answers, best left for counsel to decide." *Id.* (internal quotation marks and citation omitted).

Relying on these principles, the Idaho Court of Appeals rejected Claim 6(f) on both *Strickland* prongs:

> [T]he district court did not err in finding that decisions made by trial counsel during closing argument fell within the wide range of reasonable professional assistance, and that there was no prejudice. Absent egregious misstatements, the failure to object during closing argument and opening statement is within the wide range of permissible professional legal conduct. Even if the statement [about Meister's and Tonya's respective rights] was objectionable, Meister has not presented any evidence counsel's failure to object was not strategic. Meister also failed to prove there was no reasonable probability that the outcome of the case would have been different had trial counsel objected.

*Id.* at 34 (internal quotation marks, citations, and alterations omitted).

iii.    <u>The State Court's Rejection of Claim 6(f) Was Not Unreasonable</u>

The Idaho Court of Appeals reasonably applied *Strickland* and its progeny in rejecting Meister's claim about the prosecutor's "rights" comments. The state court

correctly stated that "judicial review of a defense attorney's decisions during closing argument is highly deferential." *State's Lodging F-4 at 34.*

This is entirely consistent with *Yarbrough v. Gentry*, 540 U.S. 1 (2003), which addressed the deference owed to a defense attorney's decisions with respect to their own closing argument. In that case, the Supreme Court stated:

> The right to effective assistance extends to closing arguments. Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should sharpen and clarify the issues for resolution by the trier of fact, but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. *Judicial review of a defense attorney's summation is therefore highly deferential—and doubly deferential when it is conducted through the lens of federal habeas.*

*Id.* at 5–6 (emphasis added) (internal quotation marks and citations omitted).

Moreover, in the specific context of objecting during the state's closing argument, the Ninth Circuit has explained that a defense lawyer might *wisely* choose silence during a prosecutor's closing argument specifically to avoid emphasizing, or highlighting in the minds of the jurors, the statement the prosecutor has just made. *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) (relying on *Necoechea*, 986 F.2d 1273). It is for this reason that, "absent egregious misstatements, the failure to object during closing argument … is within the wide range of permissible professional legal conduct." *Id.* (internal quotation marks omitted).

This Court agrees with the state court that the prosecutor's argument appropriately "pointed to the evidence in asking for a conviction." *State's Lodging F-4* at 34. Thus, the decision not to object to the due process comment was objectively reasonable. Moreover, given the extensive evidence of guilt presented at trial, Meister has not shown a reasonable probability that an objection to the prosecutor's trial-rights comment would have resulted in an acquittal. A fair-minded jurist could conclude that Meister cannot met either prong of *Strickland* on this issue. Accordingly, the Court must deny Claim 6(f).

### 6.   Meister Is Not Entitled to Relief on Claim 8(b)

Claim 8(b) asserts that defense counsel should have argued to the trial court that the jury room was not insulated from sound, which allegedly exposed the jury "to extrinsic evidence and argument." *Pet*. at 11.

#### A.   *Factual Basis for Claim 8(b)*

Meister states that, "[o]n several occasions throughout the years 2003 to 2012," he has been inside the jury room of the courtroom in which he was tried. *Pet*. at 19. He contends that the "voices of the judge and counsel" are audible from the jury room, and that during jury deliberations in his trial, Meister and everyone else in the courtroom "could distinctly hear the jury playing" an exhibit. *Id*. In state court, Meister submitted a declaration from another person to the same effect. Meister's defense counsel did not object on the basis that the jury room was insufficiently insulated from sound.

#### B.   *State Court Decision*

The state district court found that Meister had not provided adequate evidence that the jury room was insufficiently insulated. *State's Lodging F-4* at 39. On appeal from the

dismissal of his post-conviction petition, Meister raised a trial-error claim that the jury was not properly insulated from sound; this is set forth in the Petition as Claim 8(a) (which this Court previously dismissed as procedurally defaulted). Meister also raised Claim 8(b)—the related claim that counsel was ineffective for failing to object on that basis.

As the Court has already explained, the Idaho Court of Appeals rejected Claim 8(a), the trial-error claim, on a procedural basis. *See Memo. Dec. and Order*, Dkt. 24, at 10, 17–18. The state appellate court did not expressly address Claim 8(b), nor did it discuss trial counsel's representation with respect to the jury room issue at all.

### C.   *Claim 8(b) Fails on De Novo Review*

The Court need not determine whether the Idaho Court of Appeals impliedly rejected Claim 8(b) on the merits, or if it simply overlooked the claim. *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). This is because the Court concludes that Claim 8(b) fails on the merits even under de novo review.

Meister has not produced clear and convincing evidence rebutting the state court's finding that the jury room was sufficiently insulated from sound. Therefore, the Court must presume that factual finding correct under 28 U.S.C. § 2254(e)(1). Because the jury room was, in fact, adequately insulated from sound, Meister cannot establish either prong of *Strickland*. Because any objection would have been meritless, defense counsel did not

perform deficiently by failing to make one, and any such objection would have been overruled in any event. Therefore, Claim 8(b) fails, on de novo review, under both the performance and prejudice prongs of *Strickland*.

### 7.    Meister Is Not Entitled to Relief on the Remaining Portion of Claim 7

Finally, Meister argues cumulative prejudice from his defense counsel's alleged errors.[6] In addition to its analysis on each individual claim, the Idaho Court of Appeals also analyzed this cumulative error claim. The state court held that counsel's performance with respect to all of Meister's IAC claims was objectively reasonable. *State's Lodging F-4* at 40. Therefore, because (1) "a necessary prejudice to the application of the [cumulative error] doctrine is a finding of error in the first instance," and (2) defense counsel committed no errors, Claim 7 necessarily failed. *Id.*

This Court, reviewing counsel's entire performance de novo, concludes that trial counsel did not perform deficiently in any of the ways alleged by Meister, either alone or in combination. The trial transcript reveals that counsel defended Meister competently and zealously. Counsel faced a difficult uphill battle, given that Meister had confessed, and counsel's performance fell well within the wide range of objectively reasonable professional assistance. Because cumulative error presupposes error, and because counsel did not perform deficiently in any of the ways alleged in the Petition, Meister necessarily has failed to establish cumulative error.

---

[6] The Court has already dismissed the portion of Claim 7 asserting cumulative error based on Claims 1 and 2, which are trial-error claims. *See Memo. Dec. and Order*, Dkt. 24, at 11, 18.

## CONCLUSION

For the reasons set forth above, none of Meister's remaining claims warrants habeas relief.

## ORDER

**IT IS ORDERED:**

1.   Claims 3, 4, 5, 6, 8(b), and the remaining portion of Claim 7 are DENIED. Because all other claims have already been dismissed, this entire action is DISMISSED with prejudice.

2.   The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Habeas Rule 11.

DATED: September 27, 2022

_____
Honorable Debora K. Grasham
United States Magistrate Judge